**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| THE NATIONAL FEDERATION<br>OF THE BLIND, INC.,<br><br>Plaintiff,<br><br>v.<br><br>U.S. ABILITYONE COMMISSION, et al.,<br><br>Defendants. | Civil Action No.:  18-CV- 2965 GJH |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS, OR ALTERNATIVELY FOR SUMMARY JUDGMENT, AND**
**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

    I.     ABILITYONE PROGRAM HISTORY AND CALL FOR REFORM ................. 3

    II.    THE COMMISSION REJECTS CONGRESS' CALL FOR REFORM
         AND SECRETLY SOLICITS AND DESIGNATES AFB AS A CNA ............... 5

LEGAL STANDARD ......................................................................................... 14

    I.     MOTION TO DISMISS ............................................................................ 14

    II.    SUMMARY JUDGMENT ......................................................................... 15

ARGUMENT ...................................................................................................... 15

    I.     DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY FOR
         SUMMARY JUDGMENT, SHOULD BE DENIED. ......................................... 18

         A.    NFB has standing to challenge the Commission's unlawful and
              arbitrary designation of AFB as a new CNA in the AbilityOne
              Program ................................................................................................. 18

              1.    NFB has suffered an injury in fact. ............................................... 18

              2.    NFB's injuries are traceable to the Commission's unlawful
                    designation of AFB as a CNA. .................................................... 21

              3.    NFB's injuries can be redressed by a court order. ....................... 22

              4.    NFB has prudential standing because its interest in
                    providing knowledge-based employment are within
                    JWOD's "zone of interest." ......................................................... 22

         B.    The Commission's theory that it has unfettered discretion to
              designate CNAs is belied by JWOD's plain language, federal
              procurement and grantmaking laws, Congress' call for increased
              oversight, and the Commission's own standards. ..................................... 23

         C.    The Commission's Motion for Summary Judgment fails on the
              merits ..................................................................................................... 28

1.     The APA's notice and comment requirement applies to legislative actions, such as fundamentally altering the process to designate a CNA. ........................................................ 28

2.     The UAR or, alternatively, the FAR apply to the Commission's designation of a CNA that will receive millions of dollars in federal funds and government contracts. ................................................................................. 32

3.     The Administrative Record creates a genuine dispute of material fact surrounding the Commission's arbitrary and capricious actions. ....................................................................... 35

II.     THE ADMINISTRATIVE RECORD DEMONSTRATES THAT A PRELIMINARY INJUNCTION IS NECESSARY BECAUSE NFB IS LIKELY TO SUCCEED ON THE MERITS AND IS SUFFERING IRREPPARABLE HARM. ................................................................. 38

CONCLUSION ............................................................................................ 42

CERTIFICATE OF SERVICE ................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Alfa Laval Separation, Inc. v. United States*,
    175 F.3d 1365 (Fed. Cir. 1999) ........................................................................ 36

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................ 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 15

*Becker v. FEC*,
    230 F.3d 381 (1st Cir. 2000) .......................................................................... 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 15

*Beno v. Shalala*,
    30 F.3d 1057 (9th Cir. 1994) .......................................................................... 27

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ........................................................................................ 22

*Bona Fide Conglomerate, Inc. v. United States*,
    96 Fed. Cl. 233 (2010) .................................................................................... 27

*Bowen v. Mich. Academy of Family Physicians*,
    476 U.S. 667 (1986) ........................................................................................ 24

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................ 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................ 18

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) .................................................................................. 22, 24

*Corel Corp. v. United States*,
    165 F. Supp. 2d 12 (D.C. Cir. 2001) .............................................................. 34

*Ctr. for Reprod. Law & Policy v. Bush*,
    304 F.3d 183 (2d Cir. 2002) .......................................................................... 19

*District of Columbia v. Trump*,
    291 F. Supp. 3d 725 (D. Md. 2018) ................................................................ 18

*Doe v. Tenenbaum*,
　127 F. Supp. 426 (D. Md. 2012) ................................................................ 37-38

*E.E.O.C. v. McLeod Health, Inc.*,
　914 F.3d 876 (4th Cir. 2019) ...................................................................... 15

*Edwards v. City of Goldsboro*,
　178 F.3d 231 (4th Cir. 1999) ...................................................................... 14

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC)*,
　653 F.3d 1 (D.C. Cir. 2011) ................................................................... 29, 32

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*,
　166 F.3d 642 (4th Cir. 1999) ...................................................................... 14

*Glenwood Bridge, Inc. v. City of Minneapolis*,
　940 F.2d 367 (8th Cir. 1991) ...................................................................... 40

*Gottlieb v. FEC*,
　143 F.3d 618 (D.C. Cir. 1998) .................................................................... 19

*Grigsby Brandford & Co., Inc. v. United States*,
　869 F. Supp. 984 (D.D.C. 1994) ........................................................... 34, 35

*Hall v. DIRECTV, LLC*,
　846 F.3d 757 (4th Cir. 2017) ...................................................................... 15

*Health Systems Architects, Inc. v. Shalala*,
　992 F. Supp. 804 (D. Md. 1998) ................................................................ 34

*Healthy Teen Network v. Azar*,
　322 F. Supp. 3d 647 (D. Md. 2018) .............................................. 24, 26, 35

*INS v. Yueh-Shaio Yang*,
　519 U.S. 26 (1996) .................................................................................... 27

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
　724 F.3d 206 (D.C. Cir. 2013) .................................................................... 21

*Inv. Co. Inst. v. Camp*,
　401 U.S. 617 (1971) .................................................................................... 22

*Jacobs v. N.C. Admin. Off. of the Cts.*,
　780 F.3d 562 (4th Cir. 2015) ...................................................................... 15

*Jones v. Koons Automotive, Inc.*,
　752 F. Supp. 2d 670 (D. Md. 2010) ............................................................ 14

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ............................................................. 15

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)......................................................................... 24

*Littell v. Morton*,
   445 F.2d 1207 (4th Cir. 1971) ........................................................ 38

*Mach Mining, LLC v. E.E.O.C.*,
   135 S. Ct. 1645 (2015) ............................................................. 24, 25

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)......................................................................... 22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   587 U.S. 209 (2012)...................................................................22-23

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ......................................... 29, 30, 32

*N. Carolina Growers' Ass'n v. United Farm Workers*,
   702 F.3d 755 (4th Cir. 2012) ..................................................... 30, 32

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ......................................... 20, 40, 41

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
   522 U.S. 479 (1998)......................................................................... 18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993)......................................................................... 19

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (2017) ................................................................... 30, 35

*Perez v. Mortgage Bankers Ass'n*,
   135 S. Ct. 1199 (2015) .................................................................... 29

*Presley v. City of Charlottesville*,
   464 F.3d 480 (4th Cir. 2006) ...................................................... 14-15

*Quinteros-Mendoza v. Holder*,
   556 F.3d 159 (4th Cir. 2009) ...................................................... 24, 27

*Ramah Navajo School Bd., Inc. v. Babbitt*,
   87 F.3d 1338 (D.C. Cir. 1996)......................................................... 24

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States,*
  945 F.2d 765 (4th Cir. 1991) ........................................................................... 14

*Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of S.F.,*
  724 F. Supp. 683 (N.D. Cal. 1989) ................................................................. 32

*Shalala v. Guernsey Mem'l Hosp.,*
  514 U.S. 87, 100 (1995)................................................................................... 29

*Sherley v. Sebelius,*
  610 F.3d 69 (D.C. Cir. 2010)........................................................................... 21

*Socop-Gonzalez v. I.N.S.,*
  208 F.3d 838 (9th Cir. 2000) .......................................................................35-36

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016)..................................................................................... 18

*Sugar Cane Growers Coop. of Fl. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) .......................................................................... 20

*Thompson v. HUD,*
  348 F. Supp. 2d 398 (D. Md. 2005)................................................................. 26

*United States v. Carroll,*
  667 F.3d 742 (6th Cir. 2012) .......................................................................... 22

*Universal Health Servs. of McAllen, Inc. Subsidiary of Universal Health Servs., Inc. v.*
  *Sullivan,* 770 F. Supp. 704 (D.D.C. 1991)...................................................... 24

**Statutes**

5 U.S.C. § 551.......................................................................................................... 29

5 U.S.C. § 553...................................................................................... 17, 29, 30, 31

5 U.S.C. § 701.................................................................................................... 24, 28

5 U.S.C. § 706.................................................................................................... 26, 37

41 U.S.C. § 1708...................................................................................................... 17

41 U.S.C. § 8502...................................................................................................... 14

41 U.S.C. § 8503................................................................................................ passim

41 U.S.C. § 8504........................................................................................................ 3

## Rules

Fed. R. Civ. P. 12(b)(1)............................................................................................ 14

Fed. R. Civ. P. 12(b)(6).................................................................................. 14, 15, 18, 23

Fed. R. Civ. P. 56(a) ................................................................................................ 15

## Regulations

2 C.F.R. § 1.100 ................................................................................................ 17, 33

2 C.F.R. § 1.205 .................................................................................................... 33

2 C.F.R. § 200.24 ................................................................................................... 33

2 C.F.R. § 200.101 ................................................................................................. 33

2 C.F.R. § 200.107 .............................................................................................. 33-34

2 C.F.R. § 200.203 ................................................................................................. 34

2 C.F.R. § 200.204 ............................................................................................. 34, 36

2 C.F.R. § 200.205 ............................................................................................. 34, 36

41 C.F.R. § 51-1.1 ................................................................................................. 23

41 C.F.R. § 51-1.3 ........................................................................................... 25, 27, 31

41 C.F.R. § 51-2.2 ............................................................................................... 3, 4, 16

41 C.F.R. § 51-3.1 ................................................................................................. 30

41 C.F.R. § 51-3.2 .............................................................................................. 4, 35

48 C.F.R. § 1.101 .................................................................................................. 17

48 C.F.R. § 2.101 .................................................................................................. 34

## Other Authorities

Am. Found. for the Blind, *Contact the American Foundation for the Blind – AFB Office Locations*, http://www.afb.org/info/about-afb/contact-us/23 ................................................... 21

Consolidated Appropriations Act, 2016 Pub. L. No. 114-113, 129 Stat. 2639 (2015)................ 26

Government Accountability Office, Report to the Committee on Oversight and
  Government Reform, House of Representatives, "Employing People with Blindness or
  Severe Disabilities: Enhanced Oversight of the AbilityOne Program Needed"
  (May 2013), *available at* https://www.gao.gov/assets/660/654946.pdf............................ 26, 35

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat.
  2329 (2016)................................................................................................................... 26-27

Panel on Dept. of Def. and AbilityOne Contracting Oversight, Accountability, and
  Integrity, *2018 First Annual Report to Congress* at 20, available at
  https://www.acq.osd.mil/dpap/cpic/cp/docs/First_Annual_RTC_on_the_Panel_on_Do
  D_and_AbilityOne_Signed_18_July_18.pdf (last accessed Nov. 28, 2018)........................... 26

U.S. AbilityOne Comm'n, *History*, AbilityOne.gov (2019), https://www.abilityone.gov/
  abilityone_program/history.html .......................................................................................... 1, 19

## INTRODUCTION

In 1938, Congress enacted the Javits-Wagner-O'Day Act ("JWOD Act" or "Act") to "provide employment opportunities for people who are blind"—later amending the Act "to include people with severe disabilities"—and provide "a wide array of quality products and services[.]"  U.S. AbilityOne Comm'n, *History*, AbilityOne.gov (2019), https://www.abilityone.gov/ abilityone_program/history.html.  The Act created the AbilityOne Commission (the "Commission") and required the Commission to "designate a central nonprofit agency or agencies to facilitate the distribution . . . of orders of the Federal Government for products and services . . . among qualified nonprofit agencies for the blind . . . or other severely disabled."  41 U.S.C. § 8503(c).  After 80 years, the AbilityOne program has grown to distribute over $3 billion in federal contracts per year to 550 contractors through two Central Nonprofit Agencies (CNAs), each of whom takes approximately 4% of each contract's value.  ECF No. 2, Amended Complaint ¶¶ 1–12 ("Am. Compl.").

Now, despite calls from Congress, federal agencies, and the public for greater accountability and transparency, Am. Compl. ¶¶ 17–23, and its own long history of choosing CNAs through notice and comment rulemaking, Am. Compl. ¶¶ 35–36, Defendants, the Commission, Commission Chairperson Thomas D. Robinson, and Commission Executive Director Tina Ballard, argue that the Commission is exempt from oversight entirely.  Ironically, Defendants argue that their selection of a new CNA is justified by the existing CNAs' "dismissive[ness] of government oversight and authority."  ECF No. 24-2, Defendants' Motion to Dismiss, or Alternatively for Summary Judgment, at 10 ("Mot. to Dismiss").  At the same time, Defendants argue that they have unfettered discretion to do as they please without similar oversight, transparency, or authority.  They maintain that Plaintiff, the National Federation of the Blind ("NFB"), one of the country's leading organizations of blind persons, which offers

employment training, services, and supports to blind people, lacks standing to challenge

Commission actions that directly affect NFB's interests and the interests of its members.

Defendants also contend that this Court lacks jurisdiction to review their designation of the

American Foundation for the Blind ("AFB") as the first new CNA in over 40 years.  As a result,

Defendants argue the Commission is free to distribute tens of millions of dollars annually to

AFB pursuant to a Cooperative Agreement, on a permanent basis, without competition or

oversight.  Defendants are wrong.

On the face of its own record, the Commission has failed to establish that NFB's

Amended Complaint should be dismissed.  NFB has standing to challenge the Commission's

unlawful designation of an unqualified CNA because JWOD, its implementing regulations,

Congress' call for increased oversight, and the Commission's own policies create meaningful

standards for this Court to evaluate the Commission's arbitrary and capricious actions.

Nor does the Administrative Record submitted by Defendants eliminate genuine disputes

of material fact to support granting the Commission summary judgment.  In fact, it confirms that

NFB is likely to succeed on the merits of its claims that the Commission designated AFB as a

CNA without notice and comment, after a series of back-room deals, in violation of the

Administrative Procedure Act ("APA").  Summary judgment is also inappropriate, and a

preliminary injunction is called for, because the Commission's award of millions of federal

dollars and contracting opportunities to AFB is subject to federal procurement and grantmaking

laws.

Finally, NFB will be irreparably harmed if the Commission and AFB are permitted to

continue carrying out their unlawful Cooperative Agreement.  The Commission attempts to

bootstrap its unlawful designation under the pretext that it has merely authorized AFB to conduct

2

a study and evaluation of the AbilityOne Program.  That is simply not what the Cooperative

Agreement says.  The Commission, in its own words, has "designated" AFB as a CNA.  *See* ECF

17-2, Cooperative Agreement between AbilityOne and AFB ("Cooperative Agreement").  The

Administrative Record shows that the Commission acted arbitrarily and capriciously in altering

its process and designating AFB despite "major concern[s]" that AFB was unqualified.  A.R.

000111.[1]  Indeed, the record reveals that the Commission waived specific, mandatory

requirements all CNAs "must meet" in order to allow AFB's designation.  A.R. 000070; 76; 77

n.14.

      Defendants are not entitled to summary judgment or dismissal.  Therefore, Defendants'

Motion to Dismiss, or alternatively Motion for Summary Judgment, should be denied.  Because

NFB is likely to prevail on the merits and will suffer irreparable harm, this Court should grant

NFB's Motion for Preliminary Injunction.

## STATEMENT OF FACTS

### I.   ABILITYONE PROGRAM HISTORY AND CALL FOR REFORM

      The AbilityOne program is a federal procurement preference program that requires all

participating contractors to ensure that 75% of their direct labor hours are performed by people

who are blind or have severe disabilities.  Am. Compl. ¶ 1.  Through the AbilityOne program, if

any product or service is placed by the Commission on the AbilityOne Procurement List, any

federal agency needing that product or service must purchase it from an AbilityOne contractor.

41 U.S.C. § 8504(a).  The Commission is responsible for carrying out the mission of the

AbilityOne program of "providing employment and training opportunities for persons who are

blind or have other severe disabilities . . . ."  41 C.F.R. § 51-2.2.  It is also responsible for

---

[1] All cites to the Administrative Record will be designated as "A.R."

establishing rules, regulations, and policies "to assure effective implementation of the JWOD

Act" and for placing products and services on the Procurement List.  *Id.* § 51-2.2(a)–(b).

The Commission is required to designate CNAs to oversee and administer the program.

41 U.S.C. § 8503(c).  CNAs represent AbilityOne contractors before the Commission, evaluate

contractors' qualifications and capabilities, make recommendations to the Commission

regarding products and services to be included on the Procurement List, distribute contracts

among their contractors, and ensure contract compliance.  41 C.F.R. § 51-3.2.  CNAs also serve

as prime contractors on government contracts.  Am. Compl. ¶ 12.

Until recently, the Commission has designated only two CNAs: National Industries for the

Blind ("NIB") and SourceAmerica (formerly NISH).  Am. Compl. ¶ 6.  NIB was designated as a

CNA when JWOD was enacted.  Am. Compl. ¶ 34.  In 1976 the Commission designated

SourceAmerica as a CNA using the APA's full notice and comment process.  Am. Compl. ¶ 36.

SourceAmerica's predecessor, NISH, followed the same notice and comment designation

process.  Am. Compl. ¶ 35.

In exchange for their efforts, CNAs are well-compensated.  The Commission awards

approximately $3.3 billion in federal contracts annually.  Am. Compl. ¶ 3.  NIB takes a fee of

3.9% of each contract awarded to one of its contractors, and SourceAmerica takes a fee of

3.85%.  Am. Compl. ¶ 10.  These fees provide approximately $100 million annually in combined

revenue to the CNAs, which together have more than $100 million in reserves and assets.  *Id.*

Current AbilityOne contractors are out of step with present-day disability law and policy,

leading to widespread calls for reform of the program.  Am. Compl. ¶¶ 13–18.  The United States

Government has become increasingly aware of problems with oversight and transparency in the

AbilityOne program, primarily with respect to CNAs.  In 2013, the Government Accountability

Office identified significant problems in these areas, which have only recently started to be addressed. Am. Compl. ¶¶ 19–23. In 2015, Congress, in the Consolidated Appropriations Act of 2016 ("2016 Appropriations Act"), required the Commission to enter into written agreements with the CNAs for the first time to increase transparency and oversight. Am. Compl. ¶ 20.

In June 2016, in furtherance of Congress' call for oversight of the Commission, the Department of Defense Office of Inspector General issued an audit report about the AbilityOne program. Am. Compl. ¶ 21. The report identifies problems with oversight and specifically documents the need to make the CNAs more accountable and transparent. *Id.* In response, legislation required that the Secretary of Defense appoint a panel to address the problems identified in the audit report ("2017 NDAA"). Am. Compl. ¶ 22. In 2018, the panel submitted its first report to Congress, recommending significant program changes to AbilityOne to "create an integrated employment environment." Am. Compl. ¶ 23. The report also recommended additional oversight of the CNAs, more safeguards to prevent the CNAs from showing favoritism, and increased transparency throughout the program. *Id.*

## II. THE COMMISSION REJECTS CONGRESS' CALL FOR REFORM AND SECRETLY SOLICITS AND DESIGNATES AFB AS A CNA.

Starting in 2016, despite awareness of Congress' demand for increased oversight and accountability, the Commission initiated steps to covertly designate a new CNA to represent the interests of blind workers. The Commission formed an Executive Subcommittee comprised of the Commission Chair, and the Chair and Vice Chair of each standing Commission subcommittee. A.R. 000002; *see also* A.R. 000034 (providing that Defendants Ballard and Robinson, at one point, sat on the Executive Subcommittee). The Commission took steps to select a new CNA to "increase/foster/encourage/drive innovation and employment growth in a new business model." A.R. 000003. Despite acknowledging that the process should "take into

account implementation of the . . . 2017 NDAA . . . panel recommendations as well as other recommendations from the Commission to ensure that accountability, oversight and integrity are incorporated into the new CNA business model," the Commission nevertheless shielded its selection from public view and avoided an open and competitive selection process. *Id.*

In December 2016, members of the Commission covertly met with and courted AFB as a potential CNA. Ms. Ballard, along with the Commission's Deputy Executive Director, Kimberly Zeich, and Commission Senior Advisor Brian Hoey, first met with AFB Chief Executive Officer Kirk Adams and AFB's head of Human Resources, Sonja Shiflet, in Philadelphia, Pennsylvania to hold informal discussions regarding the designation of a new CNA. A.R. 000054. It was there that the Commission, not AFB, first broached the possibility of AFB serving as a potential new CNA. *Id.* The parties agreed that AFB would consider accepting a CNA designation and that the parties would meet again at a later date. A.R. 000055.

Over the next several months, the Commission continued its conversations with AFB. These discussions involved "strategic issues related to establishing a new CNA," "organization staffing and structure," and developing a "phased approach to address certain areas and achieve various goals." *Id.* Representatives of the Commission and AFB were the only stakeholders to participate in these meetings. Ultimately, the Commission decided to submit a Request for Proposal ("RFP") to AFB so that it could submit a Technical and Financial Proposal for review by a Technical Evaluation Team. A.R. 000138. The Commission issued the RFP to AFB in April 2017, providing AFB until March 31, 2018 to submit its response. *Id.*

The Commission underwent this solicitation process unilaterally with AFB and without affording any other organization an opportunity to apply. The Commission explicitly decided against transparency or competition, determining, inexplicably, that a competitive process

6

"would be extremely labor intensive" and would be burden on the "Commission's limited resources." A.R. 000042; 50.  It made this decision in the face of its own admission that there are only "three prominent national organizations" that could potentially serve as CNAs.  A.R. 000050.  It made no representation as to a) how its resources were so limited that it could not evaluate one or two additional responses to the RFP or b) how a lack of resources justified not engaging in a competitive process despite Congress's call for increased competition among CNAs.  A.R. 000049–50.

In March 2018, AFB submitted its proposal to the Commission, which was evaluated by the Technical Evaluation Team.  *See* A.R. 000042; *see also* A.R. 000111–40.  The team was made up of the Director for the AbilityOne Program Management Office ("PMO"), the PMO Deputy Director, and the Deputy Director of the AbilityOne Contracts and Policy Office.  A.R. 000112.[2]  Notably, the Technical Evaluation Team's assessment contains a chronology of the Commission's evaluation process for designating AFB as a CNA that diverges significantly from the procedures it had implemented in the past.  A.R. 000137–40.  Indeed, on June 7, 2018, the Commission had to alter its internal voting policy to permit it to designate a CNA by vote.  A.R. 000080–81; *see also* A.R. 000005–06 (noting that prior to June 7, 2018, "Policy 51.203 did not include CNA designation as an action in the voting protocols").

Even before the Technical Evaluation Team released its report, Commission staff, including Ms. Ballard, attempted to thwart the evaluation process.  The report reflects that at a May 1, 2018 Senior Staff meeting, the Technical Evaluation Team presented its findings and "the Executive Director [Ms. Ballard] recommended the Agreements Officer cancel the RFP issued to AFB."  A.R. 000111.

---

[2] These names have been redacted from the record.

The Technical Evaluation Team issued its initial report and assessment on June 7, 2018. A.R. 000113. It determined both that the RFP itself was inadequate and that AFB was not suitable to serve as a CNA. A.R. 000116. With respect to the RFP, the Team found that the Commission failed to adequately identify specific deliverables and the minimum expectations the Commission had with respect to end products and performance. A.R. 000120. *See, e.g., id.* ("How will the Government know if they are getting what they need from the offeror[] at the appropriate standard of acceptability if it was not articulated in the RFP?"). Indeed, the Team noted that "if the Government is looking for the offeror to be innovative in their approach, the Government should be specific as to the goals/objectives the innovation must meet, at the very minimum." *Id.* The Team reported that because there were already two CNAs in place, the RFP should have at least provided "bare minimum requirements or objectives . . . to give the offerors a foundation to base their proposal and resulting efforts on." *Id.*

Notwithstanding the shortcomings in the RFP, the Technical Evaluation Team reviewed AFB's submission and concluded that AFB lacked the ability to adequately serve as a CNA. Ultimately, the Team's overall analysis was a "100% No Confidence" vote in AFB's ability to serve as a CNA. A.R. 000132. The Team found that AFB "has low confidence in their own ability to provide definitive deliverables and actionable results on the scope of work within the period of performance allotted." A.R. 000123. It also noted "multiple deficiencies" in AFB's proposed process to increase employment among the blind. *See* A.R. 000124–25. Moreover, it found an "[a]bsence of innovative solutions," specifically, that AFB "did not address any statutory, legislative, or regulatory obstacles that could impact employment in its proposal as required in the RFP." A.R. 000126. The Team noted that AFB's proposal "offer[ed] a solution then counter[ed] its own proposed solution before any attempt [wa]s made to execute the action."

A.R. 000127.  AFB provided no clear, articulable training materials, revealing a "deficiency and lack of understanding on how to properly build a training program." *Id.*

Equally concerning was AFB's financial inability to serve as a CNA.  At the outset, the Team found that the RFP "lacked the necessary level of specificity" about AFB's finances.  A.R. 000121.  The Team found that its start-up costs and fiscal sustainability for the first five years "Does Not Meet Expectations."  A.R. 000128.  Specifically, the Team noted that it was "confused on where [AFB wa]s getting the data to make assumptions" about its financial ability to perform the first four years of its proposal.  A.R. 000129; *see also id.* (noting AFB made "arbitrary assumptions because the technical evaluation team does not understand where [AFB wa]s pulling the data from and no explanation as to the sources . . . [was] provided.").  The Team stated that AFB was relying on philanthropic donations to make up for lost profits, which the Team found to be concerning.  A.R. 000130.

Apparently, the Commission, and specifically, Ms. Ballard and the Commission's Chief of Staff, Kelvin Wood, were not satisfied with the Technical Evaluation Team's findings.  Ms. Ballard and Mr. Wood required the Technical Evaluation Team to submit an additional Memorandum for Record ("MFR") on June 19, 2018, to "justify" the Team's positions in its initial report.  A.R. 000111–12.  The MFR identified additional concerns that the Technical Evaluation Team had regarding AFB's prospective designation:

- AFB submitted multiple Technical and Financial Proposals that "contained very detailed requirements that were different than the original RFP" and were "a major concern;"
- "AFB submitted a number of questions that clearly reflected they have a completely different understanding of who is responsible for the execution of requirements within the [prospective] Cooperative Agreement;"
- AFB requested "dedicated Commission staff to perform day to day Cooperative Agreement requirements expected to be completed by them;"

- Concerns with the process used by the Commission to identify AFB as the next CNA, specifically noting that AFB was not "adequately vetted and if they ha[d] been, [the Technical Evaluation Team had] not seen any information relating to the vetting results;"

- AFB relied heavily on its history, rather than its "current capability" to serve as a CNA, which did not "compensate or overshadow any red flags;" and

- That AFB's proposed staffing levels were insufficient to execute "**any** aspect of the agreemen[t], to include Phase I." (Emphasis in original).

A.R. 000111–12.

In response to the Technical Evaluation Team's initial June 7, 2018 and follow-up June 19, 2018 MFR, various Commission officials challenged the Team's findings. First, just six days before the Technical Evaluation Team submitted its MFR, the Commission's General Counsel, Timi Nickerson Kenealy, submitted a memorandum to the voting members "to memorialize the preliminary effort of the . . . Commission General Counsel to conduct due diligence for the designation of a central nonprofit." A.R. 000070. According to Ms. Nickerson, those "preliminary research" and due diligence efforts were "conducted between June 7, 2018 and June 13, 2018," i.e., her efforts began the day the Technical Evaluation Team issued its negative findings. *Id.*

Based on her four business days of investigation, Ms. Nickerson identified three "due diligence" criteria she allegedly used to assess AFB: 1) image and motivation; 2) social and environmental responsibility; and 3) financial soundness. A.R. 000071. She provided no explanation of why image, motivation, and social and environmental responsibility (as opposed to, for example, experience, expertise, or relationships with blind people and employers) were the relevant qualification standards for a CNA. Nor did she explain why the existing qualification standards for CNAs, based in regulations, were inapplicable, concluding, instead, that that AFB was "exempt . . . from applicability of the CNA standards and responsibilities[.]" A.R. 000076-77; *see also* A.R. 000073.

Ms. Nickerson's report supplied conclusory statements that AFB satisfied each of her self-selected criteria. Her report relied on general assumptions based on unknown "documents provided by AFB; information found on the AFB website; information in the System for Award Management; general searches conducted on the Google Search engine as well as for ratings of nonprofit entities on other websites; and for current pending cases in the PACER system." A.R. 000072. Ms. Nickerson actually acknowledged that,

- "no research into any of AFB's partners or pending business before other federal agencies has been done;"

- "no search was conducted for cases that might be pending in New York state courts, the jurisdiction where AFB was incorporated;"

- "it is not known if there are any tensions between the community and AFB;"

- "[i]t is not clear how AFB intends to leverage its ability to promote information about assistive technology to translate to innovations in the workplace;"

- "due diligence research has not specifically focused on corporate social responsibility;" and,

- despite a showing that AFB's total revenue stream reported a loss of $3,960,296 in 2016 and that, because AFB did not explain any restrictions placed on its assets by donors, "there is no way to determine as of the date of this memorandum whether AFB would have access to any of these restricted assets as a potential CNA."

A.R. 000072–75.

Without addressing AFB's lack of experience or capability to meet the CNA Standards or acknowledging the shortcomings and inconsistencies of her due diligence review, Ms. Nickerson concluded that "it appears that AFB has financial resources available to conduct Phase I requirements in the Cooperative Agreement that the Commission has prepared to execute with AFB as a designated CNA." A.R. 000078. No supporting evidence of Ms. Nickerson's research or for her conclusions is included in the Administrative Record filed by Defendants. Given that, according to Ms. Nickerson, the Cooperative Agreement was already written before the

Technical Evaluation Team completed its work six days later, it is apparent that the RFP and

qualification process was a sham.[3]

Ms. Zeich submitted two letters (one before and one after the Technical Evaluation

Team's MFR was submitted to the Commission).  *Compare* A.R. 000053 (noting original date of

June 11, 2018, updated on June 18, 2018) *with* A.R. 000050 (original date of June 11, with

updated date of June 21, 2018).  Ms. Zeich explained the Commission's reasons for not engaging

in an open process:

> Holding a full and open competition for an additional CNA or two at this time
> does not make the best use of the Commission's limited resources.  There is a
> limited number of national organizations for people who are blind excluding the
> current CNA, and two of the three prominent national organizations have some
> competing business, political, or philosophical differences with the AbilityOne
> Program.  In the future, when we have a larger body of knowledge and more
> resources, I foresee competing the role of CNA(s).  In this case, the additional
> CNA proposed in the subject Decision Package will not replace or displace either
> incumbent.

*Id.* (emphasis added).  Her justification, itself, demonstrates the emptiness of her conclusion: she

gives no analysis of what additional burdens an open and competitive process involving just two

additional organizations would impose on the Commission, or why a federal agency that

manages $3.3 billion in federal contracts to over 550 contractors should find it impossibly

burdensome to engage with a total of three CNA candidates.

Finally, two days before the Commission vote, Ms. Ballard submitted her own

memorandum defending AFB as a qualified CNA.  A.R. 000108–110.  Ms. Ballard prepared the

---

[3] Additional memoranda were submitted by Amy Jensen, the Commission's Director of Business
Operations, A.R. 000056–57, and Mr. Hoey, A.R. 00054–55.  Both Ms. Jensen and Mr. Hoey's
memoranda contain only cursory information relating to the background of the AbilityOne
Program or the meetings they attended, and generally conclude that AFB was qualified, without
pointing to any substantive support for those claims.  *See, e.g,* A.R. 000054 ("I concur with the
Commission staff . . . to designated [AFB] as a new" CNA); A.R. 000057 ("I concur with the
recommendation in the establishment of a new CNA.  I further concur with the recommendation
of AFB to be designated as the new CNA.").

memorandum in response to the Technical Evaluation Team's concerns, which she summarized

into the following three areas: "1) the clarity of the RFP and AFB's response to the RFP; 2) the

lack of competition to identify designees; and 3) AFB's capability, qualifications and financial

stability to perform the work."  A.R. 000108.  Regarding the RFP, Ms. Ballard noted that it was

cancelled because her "staff later determined [it] was not advantageous to the government,"

making both the Commission's RFP describing what it wanted from a new CNA and AFB's

inadequate proposal "moot."  A.R. 000109.  Having been told that her expectations in the RFP

were unclear, she eliminated all expectations.  A.R. 000042; 111.  Having been told that AFB's

qualifications were insufficient, she exempted them from all relevant qualifications.  A.R.

000006; 76.

Regarding AFB's financial stability, Ms. Ballard stated that AFB "provided multiple

documents demonstrating AFB's capability" and that her staff could provide that information to

voting members upon request.  A.R. 000109.  Ms. Ballard went on to criticize the Technical

Evaluation Team's assessment, suggesting that while the Team identified concerns, the Team

should have provided other "alternative solutions."  *Id.*; *see also, e.g., id.* (noting the Technical

Evaluation Team "failed to provide evidence that another course of action was more

appropriate").  Based on this conclusory rejection of the Technical Evaluation Team's

conclusions, Ms. Ballard recommended that the commission "designate AFB" as a CNA.  A.R.

000110.

On June 28, 2018 at 1:47 A.M., Mr. Wood circulated Ms. Ballard's memorandum and the

Technical Evaluation Team's supplemental MFR to the Commission's voting members.  A.R

000106.  The Technical Evaluation Team's MFR contained multiple comments from Ms. Ballard

that attempted to refute the Team's position that AFB was not qualified.  *See* A.R. 000111; 142–

43. Mr. Wood gave the voting members less than 48 hours to vote. A.R. 000106. Although

JWOD requires that the Commission "consist[] of fifteen members appointed by the president,"

41 U.S.C. § 8502(b), at the time of the vote, only eight members served on the Commission.

A.R. 000106. On June 29, 2018, the Commission voted via electronic mail to designate AFB as

the next CNA. *See* A.R. 000183–96; 220–21.

## LEGAL STANDARD

### I.     MOTION TO DISMISS

Defendants argue that this Court lacks subject matter jurisdiction because they believe

that JWOD's mandatory requirement that the Commission designate CNAs provides no

manageable standards for review and that CNA designation is left to their unfettered discretion.

Similarly, Defendants contend that NFB does not have standing to challenge the Commission's

designation because of its purported limitless authority to designate CNAs.

A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of

Civil Procedure 12(b)(1). A court should grant a 12(b)(1) motion "only if the material

jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of

law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th

Cir. 1991) (citation omitted). When considering a 12(b)(1) motion, the Court "'may consider

evidence outside the pleadings without converting the proceeding to one for summary

judgment.'" *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.,* 166 F.3d 642, 647 (4th Cir.

1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the plaintiff's

complaint. *Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 681 (D. Md. 2010) (citing *Edwards

v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). However, it does not "resolve contests

surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of*

14

*Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation omitted).  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the only question for the Court is whether the plaintiff's complaint has stated a claim for relief that is plausible on its face.  Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  In assessing whether a plaintiff has alleged a claim that is plausible on its face, the Court must accept as true all the well-pleaded allegations in the complaint and construe the facts and reasonable inferences that can be drawn therefrom in the light most favorable to the plaintiff.  *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

## II.    SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  The court must view the evidence in the light most favorable to the nonmoving party.  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).  "Thus, if the evidence would permit a jury to find in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate." *E.E.O.C. v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019) (citing *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015)).

## <u>ARGUMENT</u>

The Commission's unilateral designation of AFB behind closed doors and without oversight should be vacated because the Commission failed to satisfy APA's rulemaking requirements, violated federal acquisition and grantmaking laws, and acted arbitrarily and

capriciously, resulting in harm to the interests of NFB and thousands of workers who are blind,
denying them the opportunities that Congress sought to provide by enacting JWOD.

First, the Commission has failed to meet its burden to show that NFB's Complaint should
be dismissed.  As the oldest and largest national membership organization of blind persons, NFB
has standing to challenge the Commission's unlawful designation as a direct competitor of AFB.
NFB was categorically prohibited from commenting on the designation process as it had in the
past and was denied an opportunity to be considered as a potential CNA.  Moreover, JWOD's
mandatory requirement that Defendants "shall designate" CNAs to facilitate the program, 41
U.S.C. § 8503(c), and its own regulations making it "responsible for . . . establish[ing] rules,
regulations, and policies to assure effective implementation of the JWOD Act," 41 C.F.R. § 51-
2.2(a), defeat Defendants' argument that designation is unreviewable as a matter of agency
discretion, Mot. to Dismiss at 26–31; 35–37.  Indeed, JWOD's statutory and regulatory scheme,
federal procurement and grantmaking laws, congressional appropriations statutes and the 2017
NDAA, as well as the Commission's own processes create "legal norms pursuant to which to
evaluate the challenged action."  *See id.* at 30.

Second, the Commission's claim that there is no genuine dispute of material fact and it is
entitled to summary judgment as a matter of law is refuted by its own Administrative Record.
The record creates a genuine dispute of material fact as to whether the Commission
fundamentally altered the legislative and regulatory process it traditionally followed to designate
CNAs by creating a new informal designation process through the Commission's voting policy.
This change constitutes rulemaking without following the process and procedures under the
APA.  Indeed, Congress has required the Commission to enter into written contracts with CNAs

16

to *increase* oversight, not to give the Commission carte blanche authority to do as it pleases.

Thus, the exemption the Commission cites pursuant to 5 U.S.C. § 553(a)(2) is inapplicable.

Further, the Commission's argument that the Uniform Administrative Requirements,

Cost Principles, and Audit Requirements for Federal Awards ("UAR"), 2 C.F.R. § 1.100, *et seq.*,

and the Federal Procurement Policy, 41 U.S.C. § 1708, and the Federal Acquisition Regulations

("FAR"), 48 C.F.R. §§ 1.101, *et seq.*, do not apply to a Cooperative Agreement that will award

AFB millions of taxpayer dollars ignores both the plain language of those regulations and

Congress' call for oversight.

Third, the Administrative Record shows why a preliminary injunction is necessary under

the circumstances.  By its own standards, the Commission acted arbitrarily and capriciously

when it ignored its own internal findings and regulatory requirements to designate an unqualified

CNA.  If AFB continues to act under its unlawful Cooperative Agreement with the Commission,

NFB and blind workers will be irreparably harmed because they will be shut out of the very

process that Congress created for their benefit.

Simply put, the Commission cannot be permitted to act without regard to the law, its own

congressional mandate, and principles of fairness or transparency.  As the Commission's history

and Congress's call for oversight shows, the Commission must be held accountable for its

actions and cannot continue to waste federal dollars to do what it wants without consequence.

This Court should deny Defendants' Motion to Dismiss, or alternatively Motion for Summary

Judgment, and grant Plaintiff's Motion for Preliminary Injunction.

## I.    DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY FOR SUMMARY JUDGMENT, SHOULD BE DENIED.

### A.    NFB has standing to challenge the Commission's unlawful and arbitrary designation of AFB as a new CNA in the AbilityOne Program.

As a competitor and otherwise qualified entity that provides individuals who are blind with the resources and assistance they need to obtain employment, NFB has standing to challenge the Commission's designation of an unqualified CNA.  To have standing, NFB must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).  Under the APA, NFB must also have prudential standing by showing that "the interest sought to be protected [is] arguably within the zone of interests to be protected or regulated by the statute . . . in question."  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998).  As set forth below, Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) should be denied because NFB has standing to challenge the unlawful designation of AFB as a CNA.

#### 1.    *NFB has suffered an injury in fact.*

First, NFB has identified a specific, cognizable injury in fact.  *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 737 (D. Md. 2018) (internal quotation marks and citations omitted) ("An injury-in-fact has been defined as an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.").  "While hypothetical or conjectural injuries will not suffice, an allegation of future injury may be sufficient if the threatened injury is 'certainly impending.'"  *Id.* at 738 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 409 (2013)).

NFB has suffered an injury because it competes in the same market as AFB to support blind persons to secure and succeed in knowledge-based jobs.  Courts have held that an injury in

fact is present when an entity "personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *See Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002); *Becker v. FEC*, 230 F.3d 381, 386 n.5 (1st Cir. 2000); *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998).  As the largest national organization of blind persons, NFB has a direct interest in providing the blind knowledge-based jobs in competitive integrated employment.  Am. Compl. ¶¶ 24–26.  It prepares blind people for, and connects them to, knowledge-based jobs similar to those the Commission has designated AFB to facilitate.  Am. Compl. ¶¶ 25–26; *see also* A.R. 000007 ("Commission staff recommends the Commission designate [AFB] a [CNA] to increase employment and career opportunities for people who are blind to promote employment growth in the knowledge-based sector.").  By designating AFB as a CNA, the government has given AFB an unfair advantage in the market. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding "the 'injury in fact' is the inability to compete on an equal footing . . . , not the loss of a contract.").

NFB has also suffered an injury in fact because it will have to fill the gap created by the AFB's inability to carry out JWOD's mandate.  Congress enacted JWOD to, *inter alia*, "provide employment opportunities for people who are blind[.]"  U.S. AbilityOne Comm'n, *supra* p. 1. As the Administrative Record reveals, it is the Commission's inability to adequately serve NFB's constituents that has "basically flat lined" employment for blind individuals across the country for almost 30 years.  A.R. 000056.  The Administrative Record does not identify any current programs or services offered by AFB that would increase employment of blind people.  NFB has a significant interest in serving the blind community and providing its members with employment opportunities.  If the Commission is able to unilaterally designate an unqualified

and inexperienced CNA, NFB will have to continue to dedicate its resources to make up for the Commission's failures, all while the Commission's funding flows to AFB.  This burden is significant, given that NFB could easily serve in and meet the requirements of the CNA role.

NFB has also suffered a third injury because the Commission prohibited it from engaging in the Commission's solicitation process for a new CNA.  *Cf. N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Coop. of Fl. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)) (identifying harm for purposes of injunctive relief as a deprivation "'of a procedural protection to which [plaintiff] is entitled' under the APA").  In 2016, Congress called for the Commission to increase competition between its CNAs.  Am. Compl. ¶ 20.  However, instead of engaging in a competitive process, the Commission issued a secret, noncompetitive RFP to AFB, abandoning its traditional process of designating CNAs through notice and comment, and then cancelled even that RFP process in favor of a baseless unilateral designation process.  Not only was NFB shut out of the notice and comment process, it was prohibited from responding to the RFP for a Cooperative Agreement that it had the potential to fulfill.

In fact, the Administrative Record shows that the Commission avoided the competitive process because "two of the three prominent national organizations [one of which is NFB] have some competing business, political, or philosophical differences with the AbilityOne Program." A.R. 000050.  The Commission's refusal to allow NFB to participate in the process based on political reasons is not only improper, it exposes NFB to the potential that its members will be shut out of any future knowledge-based job opportunities by the Commission's political biases.

      2.     *NFB's injuries are traceable to the Commission's unlawful designation of AFB as a CNA.*

Once a plaintiff establishes an injury, the causation prong of the constitutional standing test is "easily satisfied." *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013); *see also Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (providing that plaintiffs experience "actual, here-and-now injury" when defendants' actions "have intensified the competition for a share in a fixed amount of money" and, thus, have compelled plaintiffs "to invest more time and resources"). Here, each of NFB's injuries are directly traceable to the Commission's actions. The Commission's designation of AFB gave an advantage to a direct competitor in knowledge-based employment for the blind, giving that competitor the advantage of facilitating and distributing highly sought-after government contracts. Thus, the benefits of acting as a CNA give AFB an unfair advantage in the market. AFB has 18 months to work with the Commission, to be supported by Commission staff (who are housed in the same building and on the same floor as AFB), and to design the program for itself. *Compare, e.g.,* A.R. 000080 (identifying the Commission's address as 1401 S. Clark Street, Suite 715, Arlington, VA) *with* Am. Found. for the Blind, *Contact the American Foundation for the Blind – AFB Office Locations*, http://www.afb.org/info/about-afb/contact-us/23 (identifying AFB's headquarters at the same address in Suite 730). At the end of that process, it becomes the new CNA and accepts the financial rewards of that position. Am. Compl. ¶¶ 38, 42–23. More to the point, the Commission's solicitation of AFB without employing the traditional designation method of notice and comment ensured that NFB, its members, and all blind people would have no say in the process or its goals. Further, NFB was expressly prohibited from partaking in the RFP process because it is one of the two prominent national organizations that the Commission believes has competing philosophical and political views. A.R. 000050.

3.      *NFB's injuries can be redressed by a court order.*

Where the causation prong is satisfied, so, too, is the redressability requirement.  *See*

*United States v. Carroll*, 667 F.3d 742, 745 (6th Cir. 2012) (noting that the causation and

redressability elements of constitutional standing "often go hand in hand"); *Massachusetts v.*

*EPA*, 549 U.S. 497, 526 (2007) (holding redressability requirement met if the harm "would be

reduced to some extent" by the relief plaintiff seeks).  NFB's injuries will be redressed by

declaring that the Commission's designation of AFB is null and void, requiring the Commission

to follow the notice and comment procedures in designating an appropriate CNA, and requiring

the Commission to follow the appropriate federal procurement regulations established by the

UAR or FAR.  Granting NFB's request will ensure a fair, open, and competitive process that will

result in designating the most qualified candidate as a new CNA, rather than permitting the

Commission to unilaterally give millions of federal dollars and government contracting

opportunities to an unqualified private entity.

4.      *NFB has prudential standing because its interest in providing knowledge-*
         *based employment are within JWOD's "zone of interest."*

NFB has prudential standing because JWOD was "intended for [a particular] class [of

plaintiffs] to be relied upon to challenge agency disregard of the law."  *Clarke v. Sec. Indus.*

*Ass'n*, 479 U.S. 388, 399 (1987) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347

(1984)).  The 'zone of interest' test is "not meant to be especially demanding, in particular, there

need be no indication of congressional purpose to benefit the would-be plaintiff."  *Id.* at 399–400

(citing *Inv. Co. Inst. v. Camp*, 401 U.S. 617 (1971)); *see also Match-E-Be-Nash-She-Wish Band*

*of Pottawatomi Indians v. Patchak*, 587 U.S. 209, 225 (2012) (citations omitted) (holding

prudential standing is only defeated where a plaintiff's interest are "so marginally related to or

inconsistent with the purposes implicit in the statute" at question).  NFB easily falls within the zone of interests JWOD was designed to protect.

Like JWOD, NFB has an interest in "increas[ing] employment and training opportunities for persons who are blind[.]" 41 C.F.R. § 51-1.1(a).  To achieve that goal, NFB operates three training centers across the United States, Am. Compl. ¶ 26; spearheads entrepreneurship initiatives to support blind persons who are self-employed or work through the Randolph-Sheppard Vending program, ECF No. 17-3, Decl. of M. Riccobono ¶ 5; and provides training to state rehabilitation agencies serving blind consumers, Decl. of M. Riccobono ¶ 6.

Moreover, NFB's interests align with the zone of interests Congress has established by calling for increased competition among CNAs and more oversight of the AbilityOne program. The 2016 Appropriations Act required the Commission to enter into written agreements with CNAs to increase transparency and oversight.  Am. Compl. ¶ 20.  The 2017 NDAA called for additional steps to implement controls over AbilityOne contracts with the Department of Defense, which comprise $2.1 billion in prime contracts out of the $3.3 billion in contracts AbilityOne manages.  Am. Compl. ¶ 22.  The Government Accountability Office has found significant problems with oversight and transparency of CNAs and has called for these concerns to be address.  Am. Compl. ¶ 19.  NFB's claims that the Commission has barred it from participating in the process directly align with Congress' calls for transparency and oversight. Thus, Defendants' claims that NFB lacks standing pursuant to Rule 12(b)(6) should be rejected.

**B.      The Commission's theory that it has unfettered discretion to designate CNAs is belied by JWOD's plain language, federal procurement and grantmaking laws, Congress' call for increased oversight, and the Commission's own standards.**

The Defendants' Motion to Dismiss on the grounds that CNA designation is "committed to agency discretion," Mot. to Dismiss at 26, fails because there are multiple standards that apply

for this Court to review the Commission's unlawful designation process.  This Court begins with a strong presumption that agency action is subject to judicial review.  *Universal Health Servs. of McAllen, Inc. Subsidiary of Universal Health Servs., Inc. v. Sullivan*, 770 F. Supp. 704, 710 (D.D.C. 1991); *accord Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986).  *See also Clarke*, 479 U.S. at 399 (describing "Congress' evident intent to make agency action presumptively reviewable").  "An 'agency bears a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate.'"  *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 (D. Md. 2018) (quoting *Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015)); *see also Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162 (4th Cir. 2009) ("The Supreme Court has drawn the 'committed to agency discretion' exception extremely narrowly.").

        For an agency to overcome this narrow exception, "the relevant statute [must be] drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (internal quotation marks and citations omitted); 5 U.S.C. § 701(a)(2).  *See also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (holding that the narrow exception to overcome the otherwise strong presumption of reviewability is "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply").  A multitude of sources provide this Court with meaningful standards by which to evaluate whether the Commission unlawfully carried out its congressional mandate to designate qualified CNAs.

        First, the plain language of JWOD does not provide the Commission with unfettered discretion to designate a CNA without judicial review.  *See, e.g., Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1344–49 (D.C. Cir. 1996).  The Act unambiguously states that the

24

Commission "*shall* designate a central nonprofit agency or agencies to facilitate the distribution by direct allocation, subcontract, or any other means, of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies . . . ." 41 U.S.C. § 8503(c) (emphasis added); *see also Mach Mining*, 135 S. Ct. at 1651 (citations omitted) (noting that the word "shall" admits of no discretion).  Although Congress did not expressly carve out the process the Commission must follow to designate a CNA, it permitted the Commission to do so through "regulations . . . as necessary to carry out" its statutory duties.  41 U.S.C. § 8503(d)(1).   The Commission did so for 80 years by utilizing the notice and comment procedures for designating CNAs, such as NISH and, later, SourceAmerica.  Am. Compl. ¶¶ 34–36.  In 2015, Congress expanded the requirements for AbilityOne CNAs by requiring the Commission to enter into written agreements with the CNAs.  Am. Compl. ¶ 20.  Coupled with the Commission's historical use of notice and comment rulemaking, the new requirement for written contracts subject to the UAR or FAR makes quite clear that the Commission is not free to do as it pleases without competition, transparency, and oversight.

Further, the Commission's regulations "set forth standards that central nonprofit agencies *must* meet at 41 C.F.R. § 51-1.3."  A.R. 000076 (emphasis added); *see also* A.R. 000070; 73; 77 n.14.  The Commission has also "adopted [additional] CNA standards" listed by the Commission's Counsel.  A.R. 00077.  In the matter at hand, however, the Commission departed from those standards it had previously adopted by creating an internal process to evaluate and designate AFB through Commission vote.  *See* A.R. 000080–81; 113–40.  The statutory and regulatory language of those standards, however, unambiguously creates a framework that limit the Commission's discretion and allow this Court to determine whether the Commission acted arbitrarily and capriciously or not in accordance with the law by designating AFB as a CNA.

Second, Federal procurement laws, such as the UAR and FAR, provide meaningful standards to evaluate the Commission's designation of AFB as a recipient of federal funds. *See Thompson v. HUD*, 348 F. Supp. 2d 398, 422 (D. Md. 2005) (providing that allocation of an agency's resources "are constricted by the operation of Federal law and policies"). As discussed further, *infra*, either the UAR or the FAR applies to the federal acquisition and contracting methods the Commission used to designate AFB as a CNA. Those legal requirements provide a framework to evaluate whether the Commission acted arbitrarily and capriciously or not in accordance with the law. 5 U.S.C. § 706(2)(A).

Third, manageable standards of review can be derived from statutes related to JWOD, such as the 2016 Appropriations Act and 2017 NDAA. *See Healthy Teen*, 322 F. Supp. 3d at 658 (citations omitted) ("Demanding that a 'recipient agency . . . distribute [its] funds among some or all of the permissible objects' identified by the relevant appropriations act does not break new ground."). The 2016 Appropriations Act requires the Commission to enter into written agreements with CNAs that include key expectations for each CNA and mechanisms for the Commission to over-see their implementation, including performance goals and targets, standards and other controls to prevent fraud, waste, and abuse, and consequences for not meeting expectations. *See* Consolidated Appropriations Act, 2016 Pub. L. No. 114-113, 129 Stat. 2639 (2015) (incorporating by reference Government Accountability Office, Report to the Committee on Oversight and Government Reform, House of Representatives, "Employing People with Blindness or Severe Disabilities: Enhanced Oversight of the AbilityOne Program Needed" (May 2013), *available at* https://www.gao.gov/assets/660/654946.pdf [hereinafter, "GAO Report"]). This means that the CNA must be qualified to meet those standards before entering into such an agreement. The 2017 NDAA recommends that the Commission "explore opportunities for competition among . . . central nonprofit agencies[.]" National Defense Authorization Act for

26

Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2329 (2016).  It stands to reason that if Congress wanted to promote *more* competition among CNAs, it would not sanction a selection process devoid of competition.  Accordingly, Congress's call for oversight and specific criteria in contracts between the Commission and CNAs provides additional standards this Court can implement in reviewing AFB's CNA designation.

Even if this Court were to find that the Commission has discretion to designate a CNA, "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Beno v. Shalala,* 30 F.3d 1057, 1066 (9th Cir. 1994).  Once an agency "announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy . . . could constitute action that must be overturned . . ." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).  Even the limited criteria on which the Commission claims to have relied in the end provide some meaningful standards for this Court to review AFB's designation.  *See, e.g.,* A.R. 000071 (identifying the commissions' "due diligence" standards); A.R. 000080–81 (regulatory requirements under 41 C.F.R. § 51-1.3); A.R. 000113–40 (Technical Evaluation Team assessment).

Should this Court find that the Commission's statutory mandate to designate CNAs is "sufficient to provide [the Commission] boundless and unreviewable discretion, [it] would effectively shield any [Commission designation decision] from review based solely on [the Commission's] say so."  *See Quinteros-Mendoza*, 556 F.3d at 163.  The Commission "is not justified in relying on an irrational decision," *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 240 (2010), and cannot insulate itself from judicial review in the face of JWOD's unambiguous statutory language requiring it to designate CNAs, its own regulatory qualification

27

standards, and Congress' call for increased oversight.  Because each of the standards above

delineates meaningful standards of review, the Commission's argument that the exception carved

out in 5 U.S.C. § 701(a)(2) applies must fail.

     **C.**    **The Commission's Motion for Summary Judgment fails on the merits.**

     The Commission fails to meet its burden to establish that there is no genuine dispute of

material fact and that it is entitled to summary judgment as a matter of law.  Indeed, its

arguments are belied by its own Administrative Record.  First, the record reveals that the

Commission engaged in unlawful rulemaking without adhering to the APA's rulemaking

provisions when it fundamentally altered its historical process for designating CNAs.  Second,

the Commission fails to show why federal grantmaking and contracting laws do not apply when

an agency enters into a cooperative agreement with a private entity for millions of federal dollars

and government contracts.  Third, the Administrative Record creates a genuine dispute as to

whether the Commission not only violated the federal grantmaking and contracting laws, but

whether it acted arbitrarily and capriciously in ignoring its own internal evaluation of AFB and

waiving the standards it admits all CNAs "must meet" to justify designating AFB as a new CNA.

A.R. 000070; 73; 76; 77 n.14.

     *1.*    *The APA's notice and comment requirement applies to legislative actions,*
               *such as fundamentally altering the process to designate a CNA.*

     The Commission violated the APA by creating an entirely new CNA designation process

without complying with the APA's rulemaking provisions and providing interested persons, such

as NFB and its members, an opportunity to participate.  By abandoning the notice and comment

designation process it had used for 80 years and replacing it with a CNA designation process

based solely on staff recommendations and a Commission member vote, the Commission created

a policy for future designation that triggered the APA's notice and comment process.

The Commission does not dispute that it is an agency as defined by 5 U.S.C. § 551(1) and subject to the APA.  Section 551(4) of the APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."  Rulemaking is an agency's "process for formulating, amending, or repealing a rule."  5 U.S.C. § 551(5); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).

"An agency is generally required by the APA to publish notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal."  *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014); 5 U.S.C. § 553(b), (d).  The proposing agency must give interested persons an opportunity to submit data, views, or arguments, must consider, prior to adoption of the proposal, the relevant information submitted regarding the proposal, and publish a concise statement of the rule's basis and purpose.  *Id.* § 553(c).

Mere interpretive guidance or statements of agency policy are exempt from the APA's notice and comment provisions.  Thus, courts distinguish between "interpretive rules" and "legislative rules."  *Mendoza*, 754 F.3d at 1020–21.  The former "clarif[ies] a statutory or regulatory term" and does not subject an agency's action to the APA; the latter "adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy."  *Id.* at 1021; *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).  The ultimate question is "whether the new rule effects a substantive regulatory change to the statutory or regulatory regime."  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011).

Historically, the Commission has used the APA's notice and comment procedure to fulfill its statutory mandate to designate CNAs.  41 U.S.C. § 8503(c).  The only method the

Commission has used in the last 80 years to designate a CNA is through legislation or regulation. *See* Am. Compl. ¶ 6 (designating NIB as a CNA through legislative enactment); 41 C.F.R. § 51-3.1 (1974) (designating NIB and NISH as CNAs through regulation); 41 C.F.R. § 51-3.1 (1977) (replacing NISH with SourceAmerica through regulatory amendment).  The Commission's alteration of the CNA selection process triggered the rulemaking provisions of the APA.  *See, e.g., Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017) (providing that promulgating procedures for selecting a Local Number Portability Administrator to carry out relevant provisions of the Telecommunications Act of 1996 would be "appropriately . . . done by rulemaking").

For the first time in its 80-year history, the Commission, behind closed doors, created an entirely new informal adjudication process to designate AFB as a new CNA.  An agency's prior conduct is "highly relevant" in determining whether the agency engaged in rulemaking.  *N. Carolina Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 765 (4th Cir. 2012).  In *United Farm Workers*, the Fourth Circuit held that an agency's "formulating" and "repealing" certain regulatory processes "qualified as 'rule making' under the 'broad language' of that term," and, consequently, the agency violated the APA by failing to comply with the requisite notice and comment procedures.  *Id.* at 765–66; *see also* 5 U.S.C. § 553.

Here, the Commission historically used the notice and comment procedure to designate CNAs.  In designating AFB, however, it created an entirely new informal adjudication process that resulted in a substantive change in Commission policy.  *Mendoza*, 754 F.3d at 1021.  That new process included: Commission officials courting AFB to apply, A.R. 000054; utilizing an individually targeted RFP selection process, which Defendant Ballard abandoned after the Technical Evaluation Team submitted a 100% vote of no confidence, A.R. 000042, 111, 109,

132; a four-day "due diligence review" by the Commission's General Counsel based on three self-identified criteria, which failed to provide any support for why AFB met the criteria (and contradicted the Technical Evaluation Team's findings), *compare* A.R. 000073–76 *with* A.R. 000111–37; and a waiver of the "standards that central nonprofit agencies must meet at 41 C.F.R. § 51-1.3" and other "additional CNA standards," A.R. 000076–77. Moreover, the Commission altered its policies to allow designation of a new CNA by vote. *Compare* A.R. 000005 ("Policy 51.203 did not include CNA designation as an action in the voting protocols.") *with* A.R. 000080–81 (modifying Commission Policy 51.203 to allow members to vote on the "[d]esignation of a" CNA).

The Commission completely overlooks that it is the change in the *process* that violates the APA. Instead, it contends that its Cooperative Agreement "simply fulfill[s] its statutory mandate under 41 U.S.C. § 8503(e)" to allow continuing studies of the program. Mot. to Dismiss at 32. The Commission attempts to shield its designation of AFB under § 8503(c) by carving out in the Cooperative Agreement a period of time for AFB to "study" the program before, under the same Cooperative Agreement, automatically becoming the new CNA. The Commission's pretense that the designation of AFB as a CNA is really just a "study [of] the program" is disingenuous and contradicted by the Cooperative Agreement itself. *See generally* ECF 17-2, Cooperative Agreement.

The Commission's argument that 5 U.S.C. § 553(b) exempts from rulemaking "any matters relating to" contracts or "agency management" similarly misses the mark. Mot. to Dismiss at 34–37. First, that the Commission ultimately entered into a Cooperative Agreement, i.e., a contract, is irrelevant. What is relevant is that the Commission replaced its policy of designating CNAs through legislation and regulation with an informal procedure, thus

establishing a change in policy that triggers the APA's rulemaking provisions.  *See United Farm*

*Workers*, 702 F.3d at 765; *Mendoza*, 754 F.3d at 1021; *Elec. Privacy Info. Ctr.*, 653 F.3d at 6–7.

The Commission omits that the reason it entered into a contract in the first place was because

Congress wanted to *increase* Commission oversight, not exempt it from oversight entirely.  Am.

Compl. ¶¶ 17–23.

Second, the Commission is required by statute to designate CNAs and is subject to the

APA when it creates rules to do so.  *Compare* 41 U.S.C. § 8503(c) ("The [Commission] shall

designate a central nonprofit agency or agencies to facilitate" the program); *with Saratoga Sav.*

*& Loan Ass'n v. Fed. Home Loan Bank of S.F.*, 724 F. Supp. 683, 684 (N.D. Cal. 1989)

(providing that the Federal Home Loan Bank Board "may delegate certain of its" functions to

certain employees of regional Federal Home Loan Banks).  Simply put, the Commission cannot

do as it pleases and later offer a post-hoc justification to insulate its actions from review.

Congress' call for oversight by requiring the Commission to enter into written contracts with

CNAs cannot be used to frustrate Congress' intent.  Because the Commission fundamentally

altered its designation process and created an entirely new method for designating CNAs, the

Commission substantively altered "the statutory or regulatory regime," subjecting itself to the

APA's rulemaking requirements.  *Elec. Privacy Info. Ctr.*, 653 F.3d at 6–7.

      2.      *The UAR or, alternatively, the FAR apply to the Commission's designation*
             *of a CNA that will receive millions of dollars in federal funds and*
             *government contracts.*

The Commission's argument that it is not subject to federal law in designating a CNA to

control millions of dollars of government funds and contracts is similarly unavailing.  Either the

UAR or the FAR governs agency action that apportions millions of taxpayer dollars to private

entities.  Those regulations were designed to prevent the very conduct NFB accuses the

Commission of: unilaterally awarding a private entity government funds and contracts without oversight or a fair, open, and competitive process.

Almost 50 years after JWOD was passed, Congress enacted the Federal Grant and Cooperative Agreement Act of 1977.  This legislation was accompanied by the UAR.  2 C.F.R. §§ 1.100, *et seq.*  Because the 2016 Appropriations Act required the Commission to enter into contracts with CNAs, which took the form of cooperative agreements, the Commission was required to follow the UAR's provisions.  *See* 2 C.F.R. § 200.24 (defining a cooperative agreement under the UAR); *id.* § 1.205 (emphasis added) ("[A]ll portions of the [UAR] apply to grants *and cooperative agreements*.").

The Commission does not dispute that it failed to meet the UAR standards.  Instead, it argues that the UAR only applies to commercial procurements.  Mot. to Dismiss at 44.  The Commission provides no legal support for this proposition and it is contradicted by the UAR, itself, which applies to all "federal awards," 2 C.F.R. § 200.101(a), including "grant agreements and cooperative agreements."  *Id.* § 200.101(b).  The Commission makes a circular argument that the UAR notice and competition requirements apply only when an agency decides to make a "competitive" award.  Accepting this argument would mean that an agency may simply decide to opt out of the regulatory notice and competition requirements by deciding it prefers not to seek competitive bids.

The UAR makes clear that this argument is incorrect.  Section 200.101(b)(1) (Applicability), provides that Subparts C and D (including §§ 200.200–200.345) apply to all "grant agreements and cooperative agreements," without limitation to "competitive" or "commercial" agreements.  It goes on to list specific exemptions, none of which are applicable to the Commission.  2 C.F.R. § 200.101(d)-(e).  Section 200.107 provides that "Any exceptions will

be subject to approval by [the Office of Management and Budget].  Exceptions will only be made in particular cases where adequate justification is presented."  These exceptions are the only agreements that are not "competitive" and, therefore, not subject to the notice and competition requirements of the UAR.  The Commission's CNA Cooperative Agreement is a "competitive grant or cooperative agreement" because it is not exempted.  Accordingly, the Commission was required to satisfy the UAR requirements set forth in 2 C.F.R. §§ 200.203–205 before entering into a cooperative agreement that would give millions of taxpayer dollars to AFB.

To the extent the FAR, rather than the UAR, is applicable, the Commission violated the FAR by failing to follow its pre-contract publication requirements, permit competitive bids, or properly justify a sole source agreement with AFB.  Again, the Commission does not dispute that it did not follow relevant FAR provisions in entering into its Cooperative Agreement with AFB; instead, it contends that the FAR does not apply.

The FAR applies to government "procurements," i.e., "the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector."  *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 24 (D.C. Cir. 2001) (citations omitted).  Specifically, the FAR applies to acquisitions, which are defined as "acquiring by contract with appropriated funds of supplies or services . . . ."  48 C.F.R. § 2.101.  This Court has explained that when the government acquires a new service, it opens itself up to FAR requirements.  *Health Systems Architects, Inc. v. Shalala*, 992 F. Supp. 804, 808–09 (D. Md. 1998).  That is precisely what the Commission did in designating AFB as a new CNA.

The Commission relies on *Grigsby Brandford & Co., Inc. v. United States*, 869 F. Supp. 984 (D.D.C. 1994), for the proposition that the FAR is limited to commercial transactions, but it

ignores that its solicitation of AFB was precisely that.  Indeed, "[w]hat governs is the nature of the relationship created by the selection . . . ."  *Id.* at 998.  Here, the government solicited services from AFB both to act as a CNA and facilitate the Commission's orders for products and services through the AbilityOne Procurement List, and also to serve as a government contractor. 41 C.F.R. § 51-3.2(k).  Indeed, CNAs have historically served as both administrators of government contracts and as prime contractors on their own.  Am. Compl. ¶ 12; *see also* GAO Report at 40–41 n.d.  Thus, the nature of the relationship is one more akin to a procurement than a mere "appointment of a public employee or agent . . . ."  *Grigsby*, 869 F. Supp. at 998.

3.    *The Administrative Record creates a genuine dispute of material fact surrounding the Commission's arbitrary and capricious actions.*

The Administrative Record creates genuine disputes of material fact as to whether the Commission acted arbitrarily and capriciously—and even abused its discretion—when it refused to allow other potential CNAs to submit proposals in response to the Commission's RFP, ignored its own Technical Evaluation Team's evaluation, waived CNA qualification requirements, and supplemented the record with conclusory, post-hoc justifications to designate AFB as a new CNA.  Indeed, the Administrative Record shows that the Commission disregarded its own statutory mandate, regulations, and internal standards to justify its designation of AFB.

An agency's action is arbitrary and capricious if it "fail[s] to consider 'relevant factors' or 'relied on factors which Congress has not intended it to consider.'"  *Healthy Teen*, 322 F. Supp. 3d at 659.  *See also Neustar, Inc.*, 857 F.3d at 893 (citations omitted). ("[An] informal adjudication[] still must comply with the familiar APA standard banning arbitrary and capricious actions.").  Agency policy itself can provide standards by which a court can assess whether the agency's ultimate decision is arbitrary and capricious.  *See Socop-Gonzalez v. I.N.S.*, 208 F.3d 838, 844 (9th Cir. 2000), *on reh'g en banc*, 272 F.3d 1176 (9th Cir. 2001) ("[E]stablished

policies of an administrative agency may provide the law by which to judge an administrative action or inaction[.]").

The UAR and FAR provide guiding principles to determine whether an agency acted arbitrarily and capriciously.  For example, had the Commission followed the UAR, the FAR, or its own CNA qualification standards, AFB would not have been a qualified CNA.  There is a genuine dispute as to whether AFB would have passed the merit review process requirements of 2 C.F.R. § 200.204.  The Technical Evaluation Team noted that AFB submitted conflicting technical and financial proposals, which "was a major concern."  A.R. 000111.  The Technical Evaluation Team's report further showed that AFB was not "adequately vetted, and if they have been" there was no "information relating to the vetting results."  *Id.*  Further, under § 200.205, the Commission would have had to evaluate the risk posed by AFB, including its financial stability, quality of management systems, history of performance, and audit reports.  The Administrative Record shows that, in 2016, AFB showed a total revenue loss of $3,960,296, A.R. 000075, and the Technical Evaluation Team found that AFB's "CNA start-up Costs and Fiscal Sustainability Plan for the First Five Years" "Does Not Meet Expectations," A.R. 000128. This resulted in the Technical Evaluation Team providing a "100% No Confidence" vote in AFB.  A.R. 000132.

Similarly, genuine issues of material fact exist regarding whether AFB could have been designated if the Commission had applied the competition principles of the FAR.  *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  As set forth in the Memorandum in Support of NFB's Motion for Preliminary Injunction, NFB would have submitted a proposal requesting that it be considered for designation as a CNA.  Decl. of M. Riccobono ¶ 9. Given its knowledge of innovative employment opportunities, careers and lines

of business for people who are blind, and the interests and needs of blind veterans, NFB is uniquely situated to provide the services described in the Cooperative Agreement.  Decl. of M. Riccobono ¶ 10.  Indeed, NFB would not have needed the five-year phase-in period AFB required before it would be deemed qualified to meet the necessary regulatory requirements.  *Id.*

Moreover, the Administrative Record is rife with examples of the Commission's departure from its own standards to justify AFB's designation.  For example, the Commission's General Counsel's "Due Diligence" memorandum sets forth only three criteria required to satisfy its due diligence review: 1) Image and Motivation; 2) Social and Environmental Responsibility; and 3) Financial Soundness.  A.R. 000071.  These criteria have no basis in the Commission's regulatory CNA standards, from which it exempted AFB.  Indeed, on their face, two of the three criteria are unrelated to the Scope and Objectives of the Cooperative Agreement the Commission entered with AFB.  ECF 17-2, Cooperative Agreement at 8-9 (Phase I), 30, (Phase II), 51 (Phase III).  Yet the record fails to provide evidentiary support as to how AFB meets (or does not meet) these criteria.  *See supra* pp. 10–12; A.R. 000072–75.

The Commission cancelled its RFP when it became apparent that AFB was not qualified, further revealing the arbitrary and capriciousness of the Commission's decision.  *See supra* pp. 12–13; A.R. 000111; 123–31.  Finally, the Commission, on the recommendations of Ms. Zeich and Ms. Ballard, simply ignored its own evidence that AFB was not qualified and declined to implement a competitive process to engage either of the other two "national organizations for people who are blind" simply because it would require more effort and require them to interact with people with philosophical or political differences of opinion.  A.R. 000050.[4]

---

[4] For these reasons, the Commission's designation is also an abuse of discretion in violation of the APA.  *See* 5 U.S.C. § 706(2)(A); *Doe v. Tenenbaum*, 127 F. Supp. 426, 453 (D. Md. 2012) ("[A]n agency's interpretation of . . . its own regulations amounts to an abuse of discretion where

These facts, taken in the light most favorable to NFB, establish that genuine disputes of material fact exist to warrant denial of Defendants' Motion for Summary Judgment.  Contrary to its contention, the Commission did not "ably set[] forth . . . its reasoning for choosing AFB sufficiently such that this Court may discern a rational connection between the decision-making process and the ultimate decision."  Mot. to Dismiss at 43.  Indeed, the record shows that the Commission was bent on designating AFB and refused to consider other, more qualified candidates.  It solicited AFB from the outset, changed its designation process and voting protocols, rejected the Technical Evaluation Team's 100% vote of no confidence, cancelled an RFP it solicited when it was apparent that AFB could not meet its requirements, and exempted AFB from most of the qualification requirements for CNAs.  For these reasons, Defendants' Motion for Summary Judgment Should be denied.

## II.   THE ADMINISTRATIVE RECORD DEMONSTRATES THAT A PRELIMINARY INJUNCTION IS NECESSARY BECAUSE NFB IS LIKELY TO SUCCEED ON THE MERITS AND IS SUFFERING IRREPPARABLE HARM.

The Administrative Record submitted by Defendants further supports NFB's position that injunctive relief is appropriate under the circumstances.  First, NFB is likely to succeed on the merits because the Commission engaged in rulemaking without following the APA's notice and comment requirements, violated the UAR or FAR processes, and acted arbitrarily and capriciously in designating AFB as a CNA.  The Commission does not dispute that it has traditionally fulfilled its statutory mandate to designate CNAs through legislative and regulatory designation via notice and comment.  Mot. to Dismiss at 10.  For the first time in JWOD's 80-year history, the Commission fundamentally altered that designation process, replacing it with a

---

it strays substantially from previous agency interpretations."); *accord Littell v. Morton*, 445 F.2d 1207, 1211 (4th Cir. 1971) (providing that an agency decision "would be an abuse of discretion if it . . . inexplicably departed from established policies").

staff recommendation and a Commission vote.  *See supra* pp. 28 – 32.  Indeed, the Commission altered Policy 51.203 precisely for that purpose.  A.R. 000005; 80–81.

Moreover, the Commission acted contrary to established law and arbitrarily and capriciously in violation of the APA.  The Commission failed to follow applicable federal procurement regulations, such as the UAR or FAR, when it designated AFB without competition, without public notice, and without conducting a thorough review of AFB on the merits.  *See supra* pp. 32–35.  Even if those regulations did not apply, the Commission acted arbitrarily and capriciously under its own internal adjudication process by requiring AFB to submit an RFP, which resulted in a finding that AFB was not qualified, causing Ms. Ballard to revoke the RFP.  *See supra* pp. 35–38.  Further, the Commission acted arbitrarily and capriciously by identifying CNA requirements, then exempting AFB from those standards and yet declaring that AFB was qualified.  *See* A.R. 000076–77; *see also* A.R. 000004; 6; 54; 57; 110.  These violations of the APA, which the Commission does not contest, show that NFB is likely to succeed on the merits.

Second, without injunctive relief, NFB will be irreparably harmed by the Commission's failure to permit NFB to participate in any meaningful way in the selection process of a new CNA to "establish knowledge-based jobs as options for people participating in the AbilityOne Program."  A.R. 000073.  First, the Commission's decision to prohibit NFB from being considered as a CNA because of its "competing business, political, or philosophical differences," A.R. 000050, reveals that NFB will be irreparably harmed.  The Commission has expressly stated that it will not work with NFB, despite NFB's experience developing programs strategically focused on "propelling the blind into knowledge-based jobs in competitive integrative employment."  Decl. of M. Riccobono ¶ 3.  By altering its designation process, the

Commission has also shut NFB and its members out of the notice and comment process it has traditionally employed. The loss of these opportunities are, in and of themselves, evidence of irreparable harm. *See N. Mariana Islands*, 686 F. 2 Supp. 2d at 17; *see also Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371–72 (8th Cir. 1991).

Even more concerning is that if the Commission and AFB move forward with the Cooperative Agreement, it will fundamentally alter the AbilityOne program. Those changes would result in irreparable harm for which NFB cannot be compensated. The Commission's goal in designating AFB is not simply to allocate funding and power, but to completely overhaul the AbilityOne Program. *See* A.R. 000042 (discussing "pilot" program to use "innovative approaches . . . for increasing employment in the blind community" and develop "new lines of business"); *see also* A.R. 000049–50; 57. NFB has long advocated for such an overhaul to align the AbilityOne program with current disability law and policy, with current expanded understanding of the capabilities of blind people, and with the growing industries and jobs of the 21st Century. Permitting AFB to continue with Phase I and, ostensibly, enter into Phases II and III, would result in an unqualified CNA redesigning the AbilityOne program and implementing the redesign without actually being capable of being "innovative and forward thinking in the types of jobs people who are blind want." A.R. 000057. By then, there will be no way for NFB and the blind community to undo the damage.

Third, the balance of equities weighs in favor of granting the requested relief. Incredibly, the Commission argues that the blind community will "suffer significant harm resulting in further job stagnation" despite acknowledging that the Commission has been aware of this stagnation for almost 15 years. *See, e.g.,* A.R. 000048 (statement by the Deputy Director of the Commission that she "became aware of the stagnation in growth of employment opportunities . .

. around 2005 or 2006"); A.R. 000056 (statement by the Director of Business Operations that "the unemployment rate for people who are blind" has been 70% for "30 years").  The Commission argues that enjoining the Cooperative Agreement "will significantly jeopardize on-going discussions with federal procurement executives," Mot. to Dismiss at 48, but gives no insight into how those discussions are being carried out during the Phase I "Research and Studies" phase of the designation.  ECF 17-2, Cooperative Agreement at 5.  Given the Technical Evaluation Team's concerns that even AFB "has low confidence in their own ability to provide definitive deliverables and actionable results on the scope of work within the period of performance allotted," A.R. 000123, the Administrative Record reveals that more harm than good can come from AFB continuing the work contemplated in the Cooperative Agreement.

Finally, the public interest is served by a transparent and open CNA designation process. *Cf. N. Mariana Islands*, 686 F. Supp. 2d at 21 ("The public interest is served when administrative agencies comply with their obligations under the APA.").  The Administrative Record recognizes that the Commission has been concerned with CNAs being "dismissive of government oversight and authority."  A.R. 000002.  The Commission's Deputy Director acknowledges that the need for competition among CNAs has been "explicit" for "several years."  A.R. 000049.  Nevertheless, the Commission argues that there is an immediate need for AFB to carry out the Cooperative Agreement because an injunction "will slow the public benefits from the increase in jobs that may flow from the uninterrupted study of and implementation of ways to increase employment for the blind in knowledge-based jobs."  Mot. to Dismiss at 49.  The Commission cannot have it both ways.  That is, it cannot acknowledge that, through its leadership, the Commission has failed to meet its statutory mandate for decades and then claim that harm will come if it is not permitted to immediately allow an unqualified CNA,

designated without public oversight or input, to continue working under an invalid Cooperative Agreement.  Congress' call for increased oversight of the AbilityOne Commission through the 2016 Appropriations Act and 2017 NDAA reveal precisely why the public will continue to be harmed by the Commission's actions if it is not enjoined from carrying out an unlawfully consummated Cooperative Agreement.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss, or alternatively Motion for Summary Judgment, and grant Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,


_____/s/_____
Eve L. Hill (Fed. Bar No. 19938)
Emily L. Levenson (Fed. Bar No. 28670)
Anthony J. May (Fed. Bar No. 20301)
BROWN GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
ehill@browngold.com
elevenson@browngold.com
amay@browngold.com

*Attorneys for Plaintiff*

Dated:  March 15, 2019

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March 2019, Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, or Alternatively for Summary Judgment, and Plaintiff's Reply in Support of Motion for Preliminary Injunction was filed through the CM/ECF system and will be sent electronically to the Defendants in this case.

_____/s/_____

Eve L. Hill
