**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

THE NATIONAL FEDERATION OF
THE BLIND                                           *

     **Plaintiff,**                                    *

v.                                                  **Case No.: GJH-18-2965**

                                                   *

U.S. ABILITYONE COMMISSION, et al.,

                                                   *

     **Defendants.**

                                                   *

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## MEMORANDUM OPINION

Plaintiff the National Federation of the Blind ("Plaintiff"), an advocacy organization, brought this action against the U.S. AbilityOne Commission (the "Commission") to challenge its selection of the American Foundation for the Blind ("AFB"), for a role assisting with administration of the agency's federal contracting program for non-profit employers of persons who are blind or have other significant disabilities. Naming the Commission, its executive director, and its chair (collectively, "Defendants"), Plaintiff alleges that the selection of AFB violated the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* Pending before the Court are Plaintiff's Motion for Preliminary Injunction, ECF No. 17, and Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, ECF No. 24. A hearing on the motions was held on September 26, 2019. ECF No. 37. For the reasons that follow, the Court will deny Plaintiff's motion and grant summary judgment to Defendants on all claims.

## I.  BACKGROUND

Plaintiff challenges the selection of AFB for a role assisting the Commission in administering a program designed to increase employment of persons who are blind or have

1

other significant disabilities. Because the nature and structure of the Commission and the program that it manages are somewhat unusual, the Court describes them in some detail before reviewing the procedural status of this case and addressing the merits of the dispute.

### A. The U.S. AbilityOne Commission and the AbilityOne Program

The U.S. AbilityOne Commission is a federal agency originally established in 1938 by the Wagner-O'Day Act as the Committee on Purchases of Blind-made Products (the "Committee"). Wagner-O'Day Act, ch. 697, § 1, 52 Stat. 1196 (1938). The Act established a federal policy of increasing employment of the blind by requiring that the federal government obtain certain products only from nonprofit agencies ("NPAs") employing blind workers. *Id.* §§ 2, 3. The Committee was created to administer this directive by determining fair pricing of the products to be purchased and selecting a "central non-profit-making agency to facilitate the distribution of orders among the agencies for the blind." *Id.* § 2. National Industries for the Blind ("NIB") was the organization designated for this role. *See* 41 C.F.R. § 301.2 (1943). In 1971, Congress amended the Act with legislation now referred to as the Javits-Wagner-O'Day Act ("JWOD" or "JWOD Act"). Pub. L. No. 92-28, 85 Stat. 77 (1971) (codified as amended at 41 U.S.C. §§ 8501–06). The JWOD expanded the mandatory procurement program to include services as well as products and to add NPAs employing the "severely handicapped" as potential suppliers alongside those employing blind workers. *Id.* § 2(a)(1)(A). The Committee, which the Act renamed to reflect the expanded program, was directed to determine which products and services would be subject to the program and to maintain a list to be published in the Federal Register. *Id.* § 2(a)(1). The Committee was also authorized to designate "a central nonprofit agency or agencies to facilitate the distribution" of orders for listed products "among qualified nonprofit agencies for the blind or such agencies for other severely handicapped." *Id.* § 2(c). Six

NPAs were originally designated as central nonprofit agencies ("CNAs") for the "severely handicapped" component of the program, but were later replaced by a single CNA, National Industries for the Severely Handicapped ("NISH"), which was created for that purpose. *See* Workshops for the Other Severely Handicapped, 41 Fed. Reg. 21,359 (May 25, 1976).

The Committee is now named by statute as the Committee for Purchase From People Who are Blind or Severely Disabled, but operates as the U.S. AbilityOne Commission, reflecting its 2006 decision to use the name "AbilityOne Program" for the program it administers. *See* Notice; Adoption of Operational Name for Agency, 76 Fed. Reg. 60,808 (Sept. 30, 2011). The statutory scheme that governs the agency, parts of which are largely unchanged from the JWOD Act, charges the fifteen-member Commission with maintaining the "procurement list" of products that the government may only purchase from qualified NPAs employing blind or severely disabled workers. 41 U.S.C. §§ 8502, 8503(a), 8504.[1] The current provision relating to CNAs, 41 U.S.C. § 8503(c), directs that the Commission "shall designate a central nonprofit agency or agencies to facilitate the distribution . . . of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled." § 8503(e) of the statute further directs that the Commission "shall make a continuing study and evaluation of its activities under [the JWOD Act] to ensure effective and efficient administration of [the Act]," and provides that the Commission may work on its own or "with other public or nonprofit private agencies" to study "problems related to the employment of the blind and other severely disabled individuals" and

---

[1] To qualify for the program, a nonprofit organization must "operate[] in the interest" of either blind or severely disabled individuals and must employ blind or severely disabled workers for at least 75 percent of the hours of "direct labor" required to produce the products or provide the services that the organization seeks to offer to the government. 41 U.S.C. §§ 8501(3), (6), (7); *see also United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 271 (4th Cir. 2014).

"the development and adaptation of production methods that would enable a greater utilization of the blind and other severely disabled individuals." *Id.* § 8503(e). Currently, approximately 550 NPAs participate in the AbilityOne Program. Comm. for Purchase From People Who Are Blind or Severely Disabled, Fiscal Year 2019 Budget Justification 3, https://www.abilityone.gov/commission/documents/CPPBSD%20FY2019%20Budget%20Justification%2020180212%20Final.pdf.[2] The NPAs collectively employ approximately 45,000 workers and make more than $3.3 billion in sales annually. *Id.* at 1, 25.

The Commission has also promulgated regulations governing the operation of the AbilityOne Program pursuant to authority granted by 41 U.S.C. § 8503(d). The regulations establish an expansive set of duties for designated CNAs. Among other requirements, each CNA must: represent affiliated NPAs before the Commission; evaluate the NPAs' qualifications and capabilities and report that information to the Commission; gather information from other government components about their procurement needs; recommend products or services for the procurement list and recommend and continually reevaluate pricing; distribute procurement orders among affiliated NPAs and oversee compliance with orders and with the statutory and regulatory requirements of the AbilityOne Program, including through site visits; and perform other administrative functions for the Commission, including activities to increase awareness of the Program across the government and among the public. *See* 41 C.F.R. § 51-3.2. CNAs may also act as contractors when permitted by the Commission. *Id.* § 51-3.2(k). Importantly, the regulations authorize CNAs to charge fees to the NPAs whose contracts they facilitate. *Id.* § 51-3.5. Fees are calculated as a percentage of the NPAs' sales to the government through the

---

[2] This document and other online documents referenced in this section were cited and linked to in Plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, ECF No. 17-1 at 2. *Cf. Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 38 n.1 (D.D.C. 2019).

AbilityOne Program but are capped by a fee ceiling set by the Commission. *Id.* Commission

materials included in the Administrative Record refer to these charges as "Program Fees." *See*

ECF No. 26-3 at 21.[3]

NIB and NISH, which is now known as SourceAmerica, have continued to serve as the

CNAs for blind workers and disabled workers, respectively, since their original designations.

NIB's fee ceiling is 3.9 percent of each contract, while SourceAmerica's ceiling is 3.85 percent.

U.S. Ability One Comm'n, Fiscal Year 2017 Performance Accountability Report 22,

https://www.abilityone.gov/commission/documents/U.S.%20AbilityOne%20Commission%20F

Y%202017%20PAR-Final.pdf. Together these Program Fees provide approximately $100

million annually in combined revenue to the two CNAs, which collectively have more than $100

million in reserves and assets. *Id.* In December 2015, Congress adopted legislation requiring that

the Commission enter into written agreements with each of its CNAs within 180 days, without

which no CNA could collect fees under the AbilityOne Program. Consolidated Appropriations

Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2639 (2015). According to the Amended

Complaint and Plaintiff's memorandum in support of its motion for a preliminary injunction, the

Commission entered "cooperative agreements" with NIB and SourceAmerica in 2016. ECF No.

2 ¶ 20; ECF No. 17-1 at 7. Plaintiff asserts that Congress's directive was motivated in part by a

2013 Government Accountability Office report identifying significant issues with oversight and

transparency of CNAs. ECF No. 2 ¶¶ 19–20; ECF No. 17-1 at 7. Plaintiff's submissions also

note subsequent reports from the Department of Defense identifying oversight issues with the

Program. ECF No. 2 ¶¶ 21–23; ECF No. 17-1 at 7–8.

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system. ECF No. 26-3 is the certified Administrative Record that Defendants have submitted.

## B. Designation of American Foundation for the Blind as a CNA

Until 2018, NIB and SourceAmerica were the only CNAs designated by the Commission. In July 2018, however, the Commission entered a cooperative agreement (the "July 2018 Agreement") with the American Foundation for the Blind, an organization that promotes the interests of the blind and visually impaired, and designated it to serve as a new CNA for NPAs employing blind workers. ECF 17-2 at 2, 7. In its introductory materials, the Agreement states that it "provides a framework for a new CNA model in the AbilityOne Program that places the focus on increasing job placement and career advancement opportunities in knowledge-based positions." *Id.* at 2. It then establishes a three-phase, five-year process for AFB to begin operating as a CNA. *Id*. In Phase I, which is to last up to 18 months, AFB is directed to "conduct research and studies" that meet a number of objectives, including identifying "innovative employment opportunities/careers and lines of business for people who are blind" and "a world-class public-private operational structure that defines the relationship and responsibilities among the Commission, CNAs, and NPAs." *Id.* at 8–9, 26. The Commission will also "continue the vetting process" for AFB during Phase I and will conduct mandatory quarterly reviews to determine the effectiveness of AFB's studies. *Id.* at 7, 9. AFB will also be exempt at Phase I from the CNA duties imposed by Commission regulations at 41 C.F.R. § 51-3.2, but must implement ethics programs and conflict-of-interest and governance policies for its management. *Id.* at 14, 20–24.

At Phase II, which is to last up to 30 months, AFB is to implement the recommendations and findings from the studies it conducted at Phase I and begin gradually executing CNA duties with the approval of the Commission, though it will remain exempt from the requirements imposed by 41 C.F.R § 51-3.2. *Id.* at 30, 35. To determine whether AFB is capable of becoming

a fully functional CNA, the Commission will conduct reviews twice per year in which AFB must submit detailed lists of the services it is capable of providing to NPAs participating in the AbilityOne Program and other information detailing its implementation of the procedures and recommendations it developed at Phase I. *Id.* at 30. If AFB demonstrates that it has become compliant with the CNA requirements, it may begin collecting Program Fees. *Id.* at 35, 41–42. Finally, at Phase III, which will last up to 18 months, AFB will become a fully functioning CNA compliant with the requirements of § 51-3.2, though the Commission will continue conducting reviews twice each year until the Phase is complete. *Id.* at 51, 70.

### C. Parties and Procedural History

Plaintiff National Federation of the Blind filed a Complaint challenging the Commission's designation of AFB and the July 2018 Agreement on September 26, 2018, ECF No. 1, and filed an Amended Complaint the same day, ECF No. 2. According to the Amended Complaint, Plaintiff is "the oldest and largest national organization of blind persons," has approximately 50,000 members and affiliates in all fifty states, the District of Columbia, and Puerto Rico, and is "widely recognized by the public, Congress, executive agencies of state and federal governments, and courts as a collective and representative voice on behalf of blind Americans and their families." ECF No. 2 ¶ 24. Plaintiff further states that its "ultimate purpose . . . is the complete integration of blind individuals into society on a basis of equality," which it furthers in part by developing and advocating for policies to increase employment of blind adults as well as by operating three vocational training centers for the blind in Minnesota, Colorado, and Louisiana. *Id.* ¶¶ 25–26. The Amended Complaint names as defendants the U.S. AbilityOne Commission and its chairperson Thomas Robinson and executive director Tina Ballard, who are sued in their official capacities. *Id.* ¶ 27.

Four counts, which are styled as "causes of action," are included in the Amended Complaint: violation of the Administrative Procedure Act ("APA") for designating AFB without using the APA's notice and comment procedures, *id.* ¶¶ 67–77; violation of the APA for designating AFB in violation of certain statutes and regulations governing federal procurement and awards, without a rationale for selecting AFB as a CNA, and without a rationale for not soliciting or considering other potential choices, *id.* ¶¶ 78–83; violation of regulations governing procedure for making federal awards, *id.* ¶¶ 84–89; and violation of federal procurement statutes and regulations, *id.* ¶¶ 90–95. Plaintiff requests that the Court issue a declaratory judgment that the designation and July 2018 Agreement violated the APA and federal procurement and award law, vacate the designation and Agreement, issue preliminary and permanent injunctions barring implementation of the Agreement and requiring the agency to comply with the APA and governing procurement law in designating any CNAs, appoint a special master to ensure compliance with the Court's order, and award fees and costs. *Id.* at 21–22.

Plaintiff filed a Motion for Preliminary Injunction and an accompanying Memorandum in Support on December 6, 2018. ECF Nos. 17, 17-1. On February 8, 2019, Defendants filed a Motion to Dismiss, or Alternatively, for Summary Judgment, and an accompanying Memorandum in Support. ECF Nos. 24, 24-2. Defendants filed the Certified Administrative Record of the Commission's actions relating to its decision to designate AFB and its execution of the July 2018 Agreement on February 15, 2019. ECF No. 26-3. On March 15, 2019, Plaintiff filed a Response in Opposition to Defendants' Motion and Reply in Support of its Motion for Preliminary Injunction. ECF No. 30. Defendants filed a Reply to Plaintiff's Response on April 12, 2019. ECF No. 34. The Court held a hearing on September 26, 2019. ECF No. 37.

## II.    STANDARD OF REVIEW

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants have moved to dismiss this case pursuant to Rule 12(b)(1), asserting that the

Court lacks subject matter jurisdiction over Plaintiff's claims because Plaintiff lacks standing. "A

district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) 'only if the material jurisdictional facts are not in dispute and the moving party is

entitled to prevail as a matter of law.'" *Upstate Forever v. Kinder Morgan Energy Partners,

L.P.*, 887 F.3d 637, 645 (4th Cir. 2018) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647

(4th Cir. 1999)). "The burden of establishing subject matter jurisdiction rests with the plaintiff."

*Demetres v. East West Constr.*, 776 F.3d 271, 272 (4th Cir. 2015). "When a defendant challenges

subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings

as mere evidence on the issue, and may consider evidence outside the pleadings without

converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647 (quoting

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.

1991)).

### B.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants have also moved to dismiss the case pursuant to Rule 12(b)(6) on the ground

that the Amended Complaint fails to state a claim upon which relief can be granted. To state a

claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere

recital of elements of a cause of action, supported only by conclusory statements, is not sufficient

to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439

(4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*, 550 U.S. at 570). When performing this inquiry, the Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court need not, however, accept unsupported legal conclusions, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).

### C. Motion for Summary Judgment Pursuant to Rule 56(a)

Defendants move in the alternative for summary judgment on each of Plaintiff's claims. Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. *See Otsuka Pharm. Co., Ltd. v. Burwell*, No. GJH-15-852, 2015 WL 3442013, at *5 (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012)). Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See id.* (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)). "[T]he function of the district court is to determine

whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F. Supp. 3d 28, 38 (D.D.C. 2018) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).

Under the APA, the Court shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(D)). "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). Courts "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Sanitary*

*Bd. of City of Charleston v. Wheeler*, 918 F.3d 324, 333 (4th Cir. 2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Courts "will vacate agency action if it is not 'based on a consideration of the relevant factors' or where 'there has been a clear error of judgment.'" *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

### D. Motion for Preliminary Injunction

Plaintiff has moved for a preliminary injunction barring Defendants from implementing the July 2018 Agreement. The grant of a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "In order to receive a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter*, 555 U.S. at 20). "Each of these four requirements must be satisfied." *Id.*

### III. DISCUSSION

Defendants raise two threshold issues, contending that Plaintiff lacks standing for this action and is not within the zone of interests of the relevant statute, and that the designation of AFB is a decision committed to the agency's discretion and is therefore judicially unreviewable under the APA. ECF No. 24–2 at 23–31. Defendants then address the merits, asserting that the designation (1) was not a rulemaking and therefore did not require APA notice and comment procedures, or alternatively is a rulemaking but is subject to the notice and comment exception

for decisions of agency management and contracting, *id.* at 31–37; (2) was not subject to the federal procurement statutes and regulations that Plaintiff alleges were violated, *id.* at 37–40, 43–45; and (3) was not substantively arbitrary and capricious under the APA because the Commission articulated discernible rationales for its decisions, *id.* at 40–43. These issues are now considered in turn.

## A.  Standing and Reviewability

At the motions hearing, Defendants conceded Plaintiff's standing for this action. Because federal courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged," the Court briefly reviews Plaintiff's standing arguments. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Concluding that Plaintiff indeed has standing, the Court then turns to Defendants' agency discretion argument, which is unpersuasive.

### 1.  Standing

"Article III of the U.S. Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (quoting U.S. Const. art. III, § 2). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). "To invoke federal jurisdiction, a plaintiff bears the burden of establishing the three 'irreducible minimum requirements' of Article III standing." *Id.* (quoting *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013)). The plaintiff must demonstrate "(1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a 'fairly ... trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *David*, 704 F.3d at 333 (alterations in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554

U.S. 269, 273–74 (2008)). A plaintiff must demonstrate standing "for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), but may put forth multiple theories of standing for a claim, only one of which must be sufficient for the claim to advance, *see Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016); *see also Suhre v. Haywood County*, 131 F.3d 1083, 1085 n.* (4th Cir. 1997).

Plaintiff's Amended Complaint asserts an injury that is procedural in part: Plaintiff alleges that it was denied the opportunity to submit comments on the designation of AFB, which it would have been entitled to do if Defendants had used APA notice and comment procedures. ECF No. 2 ¶¶ 39, 45, 74–75. An agency's violation of procedure, however, is not enough on its own to confer standing for any party that disagrees with the agency's action. *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002). "A party has standing to challenge an agency's failure to abide by a procedural requirement only if the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Id.* Plaintiff makes multiple allegations of harm to its particularized interests that satisfy this requirement. Plaintiff explains that it is the nation's largest group advocating for the interests of the blind and that one of its "primary initiatives" is a program to increase blind employment, which it furthers by operating three employment training centers across the country and maintaining affiliates in all 50 states, the District of Columbia, and Puerto Rico. ECF No. 2 ¶¶ 24–26. Despite its similar mission, Plaintiff maintains, AFB is unqualified to serve as a CNA. *Id.* ¶¶ 41–42; *see also* ECF No. 30 at 27, 49–51. Yet as a result of a designation process that lacked the benefit of public comment – which could have revealed that other organizations were better qualified and that a competitive bidding process would be helpful to the Commission – AFB will collect millions of dollars in Program Fees each year. ECF No. 2 ¶¶ 10–11, 41–46.

In other words, Plaintiff alleges that the Commission's decision not to accept comments effectively denied Plaintiff the opportunity to pursue the right to manage and expand a multimillion-dollar program of federal contracting that furthers Plaintiff's mission. *See id.* ¶ 44; ECF No. 30 at 27–28. Plaintiff has thereby articulated a cognizable harm to its particularized interest. Importantly, when a plaintiff "seek[s] to enforce procedural (rather than substantive) rights," the plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)). Further, courts have recognized that the loss of an opportunity to pursue a benefit, including a relationship with the federal government, may be sufficient for an Article III injury in fact. *See CC Distribs., Inc. v. United States*, 883 F.2d 146, 150–51 (D.C Cir. 1989); *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029–31 (D.C. Cir. 2003).

Plaintiff also argues that as a result of the allegedly unlawful designation of AFB, Plaintiff "will have to fill the gap created by the AFB's inability to carry out JWOD's [sic] mandate." ECF No. 30 at 28. Specifically, Plaintiff contends that growth in employment of the blind has stagnated for decades because of the Commission's failure to adapt to new conditions, but that because the Commission's chosen solution for that problem will not address it, Plaintiff "will have to continue to dedicate its resources to make up for the Commission's failures." ECF No. 30 at 28–29; *see also* ECF No. 2 ¶¶ 13–18. Plaintiff further maintains that the Commission's choice of an unqualified CNA – and the continued stagnation that will result – harms Plaintiff's "significant interest in serving the blind community and providing its members with employment opportunities." ECF No. 30 at 28. An organization suffers an injury in fact when an agency action frustrates the organization's mission and compels it to divert its resources "to mitigate the

effects of the challenged action." *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 741 (D. Md. 2019) (citing *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)); *see also Am. Soc. For Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

These theories of injury in fact are sufficient to proceed to the two other prongs of standing, which are self-evidently met here. Causation plainly exists because it was Defendants' allegedly unlawful process that denied Plaintiff the opportunity to pursue the designation and necessitated its diversion of resources. And those injuries could be redressed by a judicial ruling vacating the designation of AFB and requiring Defendants to comply with the APA and federal procurement law, which is the relief that Plaintiff seeks. ECF No. 2 at 21–22. The Court therefore concludes that Plaintiff has Article III standing for the claims in this action. While plaintiffs pursuing APA claims typically must also satisfy the "zone of interests" test, which asks whether a plaintiff is "within the class of plaintiffs whom Congress has authorized to sue" under a particular statute, that test is not jurisdictional. *Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377, 1387 & n.4 (2014); *see also Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 319 (D.C. Cir. 2015). Because the Court need not raise the zone of interests question on its own, Defendants' concession of their position on standing, which had included a zone of interests argument in their briefing, obviates the need for the Court to address the test further.

### 2. Decision Committed to Agency Discretion

Defendants continue to maintain that judicial review of AFB's designation is precluded because the decision and the resulting July 2018 Agreement are agency action "committed to agency discretion by law" under § 701(a)(2) of the APA. ECF No. 24-2 at 26–31 (citing 5 U.S.C.

§ 701(a)(2)).[4] That provision "makes it clear that 'review is not to be had' in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). "In other words, judicial review is foreclosed if the 'agency action of which plaintiff complains fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001) (quoting *Strickland v. Morton*, 519 F.2d 467, 470 (9th Cir. 1975)); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based"). "[T]he mere fact that a statute contains discretionary language does not make agency action unreviewable." *Inova Alexandria Hosp.*, 244 F.3d at 346 (alteration in original) (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)). Additionally, "even if the underlying statute does not include meaningful (or manageable) standards, 'regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review.'" *Id.* (quoting *CC Distribs.*, 883 F.2d at 154); *see also Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003).

Defendants maintain that nothing in 41 U.S.C. § 8503(c), the provision of the JWOD Act directing the Commission to designate CNAs, nor anything in the Commission's regulations, provides the court with standards for reviewing the designation of AFB. ECF No. 24-2 at 28–31, ECF No. 34 at 6–8. § 8503(c) provides as follows:

---

[4] Although Defendants do not state whether their § 701(a)(2) argument supports a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(6), "a complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011).

> The Committee shall designate a central nonprofit agency or agencies to facilitate the distribution, by direct allocation, subcontract, or any other means, of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled.

Defendants are correct that nothing on the face of § 8503(c) establishes standards for the Court to apply in reviewing the Committee's designation of AFB; the statute merely directs that the Committee "shall designate" one or more CNAs. *Id.* But Defendants take too narrow a view of the scope of authorities relevant to this issue. As Plaintiff observes, Committee regulations promulgated under the authority of § 8503 establish substantial and extensive duties for CNAs. ECF No. 30 at 25. In a definitions section of the regulations, 41 C.F.R. § 51-1.3, "[c]entral nonprofit agency" is defined as

> an agency . . . designated by the Committee to facilitate the distribution (by direct allocation, subcontract, or any other means) of orders of the Government for commodities and services on the Procurement List among nonprofit agencies employing persons who are blind or have other severe disabilities, to provide information required by the Committee to implement the JWOD Program, and to otherwise assist the Committee in administering these regulations as set forth herein by the Committee.

41 C.F.R. § 51-3.2 elaborates on those responsibilities in detail. For example, the regulation provides that each CNA must make recommendations to the Committee on "suitable commodities or services for procurement" from NPAs and must recommend appropriate initial pricing and price changes in response to market conditions. 41 C.F.R. §§ 51-3.2(d), (e), (i). CNAs are also tasked with gathering information on federal contracting needs from the Committee, equitably distributing and allocating orders among participating NPAs, and representing the NPAs in dealings with the Committee. *Id.* ¶¶ 51-3.2(a), (c), (f), (g). CNAs must continually evaluate and collect data on the qualifications and capabilities of the NPAs providing goods and services through the AbilityOne Program and provide that information to the

Committee. *Id.* § 51-3.2(b). Finally, CNAs are tasked with overseeing and assisting the NPAs to ensure that they fulfill their contracts and maintain compliance with the statutory and regulatory requirements of the Program, including conducting on-site visits as necessary and reporting on those visits to the Committee. *Id.* §§ 51-3.2(h), (j).

In short, CNAs have extensive responsibilities under the statutory regime that Congress has enacted and that the Commission has detailed through regulations. Looking to the documents cited in Plaintiff's submissions that discuss the size of the AbilityOne Program, CNAs are collectively responsible for overseeing hundreds of NPAs, facilitating procurement and fulfillment of more than $3 billion in federal contracts that involve the labor of over 45,000 workers, conducting continual market research and analysis, and otherwise administering substantial and critical aspects of the AbilityOne Program. Given this extensive set of duties, it is clear that the Commission does not have unbounded and unreviewable discretion in designating CNAs. The Program cannot operate as Congress intended if CNAs are incapable of carrying out their mandatory responsibilities. It follows that when the Committee is considering a designation, it must reasonably determine whether a potential CNA is able to carry out the responsibilities of the CNA role. In fact, as Plaintiff points out, ECF No. 30 at 34, a Commission memorandum reviewing the potential designation of AFB acknowledges that these requirements are "standards that central nonprofit agencies must meet," although the memorandum discusses granting AFB a temporary exemption, ECF No. 26-3 at 77–78. The requirement that an organization be qualified for the role of CNA narrows the Commission's discretion in making designations and provides a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470

U.S. at 830. Because such a judicially manageable standard exists, the designation of CNAs is not an action committed to the agency's discretion by law under § 701(a)(2).[5]

### B. Merits Issues

Having concluded that Plaintiff has standing and that Defendants' designation of AFB is not a decision committed to agency discretion under § 701(a)(2), the Court now pauses to review the merits issues in dispute. Plaintiff's Amended Complaint purports to allege four separate causes of action challenging Defendants' designation of AFB and entry into the July 2018 Agreement, which the Court will refer to as "counts" for clarity. Count 1 alleges a violation of the APA for failure to use notice and comment procedures for the designation, ECF No. 2 ¶¶ 67–77; Count 2 alleges a violation of the APA by taking action that is arbitrary, capricious, or otherwise not in accordance with law by entering the July 2018 Agreement without following the procedural requirements of federal procurement law, *id.* ¶¶ 79–82, and by "provid[ing] no rationale for [the] selection of AFB and no rationale for [the] selection of AFB without soliciting or considering other bids by more qualified applicants," *id.* ¶ 83; Count 3 challenges the agency's alleged failure to comply with the requirements of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in entering the July 2018 Agreement, *id.* ¶¶ 85–89; and Count 4 alleges that the agency failed to comply with the requirements of the Federal Acquisition Regulation in entering the agreement, *id.* ¶¶ 90–95.

Despite Plaintiff's structuring of the Amended Complaint in this fashion, Plaintiff's challenge to the designation and July 2018 Agreement reduces to just three claims under the

---

[5] Plaintiff also contends that the Federal Acquisition Regulation provides a source of judicially manageable standards for reviewing the Commission's designation of CNAs. Courts reviewing challenges to federal contract awards have indeed determined that the FAR provides judicially manageable standards. *See Am. Cargo Transp., Inc. v. Natsios*, 429 F. Supp. 2d 139, 146–47 (D.D.C. 2006); *Saratoga Dev. Corp. v. United States*, 777 F. Supp. 29, 34–36 (D.D.C. 1991). Because the Court here finds that the Commission's regulations are sufficient to remove designation decisions from the agency's unreviewable discretion, the Court need not determine whether federal procurement law requires the same conclusion.

APA, all of which are asserted in the first two counts. The APA provides a cause of action for judicial review of agency action at 5 U.S.C. § 702, and at § 706 establishes the scope of that review by "authoriz[ing] a reviewing court to 'hold unlawful and set aside agency actions . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 304 (D.C. Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). § 706 additionally authorizes courts to set aside agency action that is taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(D); *see Safari Club Int'l*, 878 F.3d at 325. The first count in the Amended Complaint, asserting that Defendants unlawfully failed to use notice and comment procedures for the designation, cites the language of § 706(2)(D) in stating that the Court is empowered to set aside agency action "adopted without observance of procedure required by law." ECF No. 2 ¶ 68. That count thereby identifies the elements of one type of claim under the APA, which the Court will refer to as "the procedural APA claim."

The Amended Complaint's second count draws on § 706(2)(A), stating that the Court may set aside action that is "arbitrary, capricious, or not in accordance with law." ECF No. 2 ¶ 79. The count then makes out two different claims: a claim that Defendants acted arbitrarily and capriciously by failing to comply with federal procurement and award-making laws and regulations in making the designation and entering the July 2018 Agreement, *id.* ¶¶ 80–82; and a claim that the designation and July 2018 Agreement are arbitrary and capricious as a substantive matter because the Commission failed to provide rationales for its actions, *id.* ¶ 83.[6] For simplicity and clarity, the Court will refer to these claims as the "procurement law claim" and the "substantive APA claim," respectively. Plaintiff's third and fourth counts, though styled as

_____

[6] Language in the first count also states that "No explanation, reason or rationale was given for the unilateral designation." ECF No. 2 ¶ 74.

causes of action, merely elaborate on Defendants' alleged violations of the federal procurement and award statutes and regulations. Plaintiff does not assert that there is a freestanding cause of action that it can use to challenge violations of either the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards or the Federal Acquisition Regulation or other federal procurement provisions. Challenges to agency action taken in violation of law may be raised under the rubric of § 706(2) of the APA, which is what Plaintiff does with respect to Defendants' alleged violations of these provisions in the procurement law claim. The Court will thus treat the third and fourth counts as further argument in support of that claim. With the three claims at issue now identified, the Court will consider each in turn.

### 1. The Procedural APA Claim

The Amended Complaint's first claim, which the Court will refer to as the procedural APA claim, asserts that the designation of AFB constitutes agency action adopted "without observance of procedure required by law" under § 706(2)(D) of the APA. ECF No. ¶¶ 68–77. Specifically, the Amended Complaint contends that the designation is a rulemaking under the terms of 5 U.S.C. § 551, and therefore could not be adopted without the notice and comment procedures required for rulemaking by 5 U.S.C. § 553. *Id.* ¶¶ 54–55, 70–77. Plaintiff additionally argues that "[t]he Commission violated the APA by creating an entirely new CNA designation process without complying with the APA's rulemaking provisions and providing interested persons, such as NFB and its members, an opportunity to participate." ECF No. 30 at 37. According to Plaintiff, "the Commission replaced its policy of designating CNAs through legislation and regulation with an informal procedure, thus establishing a change in policy that triggers the APA's rulemaking provisions." *Id.* at 40–41. With this change, Plaintiff asserts, the agency "abandon[ed] the notice and comment designation process it had used for 80 years and replac[ed] it with a CNA designation process based solely on staff recommendations and a

Commission member vote." *Id.* at 37; *see also id.* at 39 (referring to this allegedly novel Commission protocol as an "entirely new informal adjudication process to designate AFB as a new CNA"); *id.* at 40 ("[I]t is the change in the *process* that violates the APA."). Thus, Plaintiff's argument relies entirely on an assumption that the process the Commission used to designate AFB is a novel creation that replaced an earlier policy of using notice and comment for designations. The historical record of the agency's past designations does not support Plaintiff's account, however.

Plaintiff's allegations about the history of the designation process are summarized in its assertion that "[t]he only method the Commission has used in the last 80 years to designate a CNA is through legislation or regulation." *Id.* at 38–39. "Regulation" refers to certain entries in the Federal Register and provisions of the Code of Federal Regulations from the 1970s that Plaintiff cites. *Id.* at 39. The reference to "legislation" appears to refer to the Amended Complaint's assertion that "[u]pon the signing of the Wagner-O'Day Act in 1938, NIB was incorporated as the designated CNA to represent contractors employing the blind." ECF No. 2 ¶ 34. Drawing on an opinion with questionable relevance here, Plaintiff stresses that "[a]n agency's prior conduct is 'highly relevant' in determining whether the agency engaged in rulemaking." ECF No. 30 at 39 (quoting *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 765 (4th Cir. 2012)). But Plaintiff's characterizations of the historical materials that it relies on for this proposition are flawed. First, the Wagner-O'Day Act, adopted June 25, 1938, did not designate National Industries for the Blind as a CNA. Instead, the statute listed "authorization of a central non-profit-making agency to facilitate the distribution of orders among the agencies for the blind" as a "duty of the Committee." Wagner-O'Day Act, ch. 697, § 2, 52 Stat. 1196 (1938).

The formal designation of NIB appears to have happened through regulation. In the 1943 Cumulative Supplement to the Code of Federal Regulations, which includes the first publication of regulations for the new Committee on Purchases of Blind-Made Products at Part 301 of Title 41, § 301.2, titled "National Industries for the Blind designated," states that "The National Industries for the Blind (hereinafter referred to as 'National Industries') is designated as the agency to facilitate the distribution of orders among the agencies for the blind." 41 C.F.R. § 301.2 (1943). Prefatory material listing the source of Part 301 identifies "Regulations approved by the Committee" in December 1938 and amended in 1939, 1940, and 1942. Those regulations do not appear to have been published in the Federal Register, leaving little question that NIB was not originally designated through a notice and comment procedure.[7] Moreover, given that notice and comment procedure did not formally exist until the APA was passed in 1946, Plaintiff's repeated contention that the Committee has used notice and comment procedures for eighty years essentially relies on an anachronism.

While the lack of Federal Register publication leaves the specifics of the NIB's formal designation as a CNA somewhat unclear, congressional testimony sheds light on the general process that the Committee used to carry out its statutory mandate.[8] In a 1944 hearing investigating aid to Americans with disabilities, the general manager of the National Industries for the Blind, C.C. Kleber, explained the organization's creation:

> When the Wagner-O'Day Act was passed by Congress, it stated that a nonprofit allocating agency should be appointed to distribute Government orders equitably to the different workshops participating in the program. The Committee on Purchases of Blind-made Products asked the American Foundation for the Blind

---

[7] The first Federal Register entry for the Committee appears to have been on June 25, 1943, noting that the Treasury Department filed a document with regulations to appear as Part 301 of Title 41 of the C.F.R., though the contents of the document were not reproduced. 8 Fed. Reg. 8722 (June 25, 1943).

[8] The Court takes judicial notice of the following Congressional materials as matters of public record pursuant to Rule 201(b)(2) of the Federal Rules of Evidence. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); *see also Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464–465 (D.C. Cir. 2018).

to act as such an allocating agency. The foundation, however, preferred to see a separate organization established. It called together representatives of a large number of workshops for the blind throughout the country and an allocating agency known as National Industries for the Blind was formed not only to allocate Government orders to the workshops, but also to provide an instrumentality through which the workshops might cooperate in behalf of the best interests of the blind.

*Aid to the Physically Handicapped: Hearing Pursuant to H. Res. 230 Before the Subcomm. to*

*Investigate Aid to the Physically Handicapped of the H. Comm. on Labor*, 78th Cong. 62, 64

(1944) (statement of C.C. Kleber, General Manager, National Industries for the Blind). Mr.

Kleber further clarified that NIB was "founded by the American Foundation for the Blind" and

that its board was made up in part of board members of AFB. *Id.* at 68. This account, which is

echoed by materials included in the Administrative Record, see ECF No. 26-3 at 13–14, makes

clear that the selection of the National Industries for the Blind was an informal, cooperative

process between the new Committee and the American Foundation for the Blind. There is

therefore little support for Plaintiff's position on NIB's designation in statute, regulation, or

congressional materials.

Plaintiff's arguments about the historical record following the passage of the Javits-

Wagner-O'Day Act in 1971 are similarly unpersuasive, as contemporary congressional materials

confirm. Enacted on June 23, 1971, the JWOD included new language on designation of CNAs,

stating that "The Committee shall designate a central nonprofit agency or agencies to facilitate

the distribution . . . of orders of the Government for commodities and services on the

procurement list among qualified nonprofit agencies for the blind or such agencies for other

severely handicapped." Javits-Wagner-O'Day Act, Pub. L. No. 92-28, § 2(c), 85 Stat. 77, 80

(1971). The first significant agency action following the Act was a "Notice of Proposed Rule

Making" published in the Federal Register on March 6, 1973. Procurement, Organization, and

Functions, 38 Fed. Reg. 6076 (proposed Mar. 6, 1973) (to be codified at 41 C.F.R. ch. 51).[9]

Among a significant amount of new and revised regulatory language was a new provision, § 51-3.1, which stated as follows:

> Under the provisions of section 2(c) of the Act, the following are designated as central nonprofit agencies: (a) To represent the workshops for the blind: National Industries for the Blind. (b) To represent the workshops for other severely handicapped: Goodwill Industries of America. International Association of Rehabilitation Facilities. Jewish Occupational Council. National Association for Retarded Children. National Easter Seal Society for Crippled Children and Adults. United Cerebral Palsy Association.

*Id.* at 6078.[10] The preamble to the proposed rule requested public comment. *Id.* at 6076.

A final rule, with § 51-3.1 unchanged, was published two months after the close of the comment period. Chapter 51—Committee for Purchase of Products and Services of the Blind and Other Severely Handicapped, 38 Fed. Reg. 16,316 (June 21, 1973). The preamble to the final rule notes that comments were received and that many provisions of the proposed rule were adjusted accordingly. *Id.* at 16,316. § 51-3.1, however, was not revised. *Id.*; *see also id.* at 16,318. Plaintiff insists that this proposed and final rule constituted the designation of new CNAs – the six organizations listed at § 51-3.1(b) – following the use of "a full notice and comment process." ECF No. 17-1 at 18–19; ECF No. 30 at 38–39. Defendants claim in response that with respect to CNA designation, the rulemaking was simply public notice of the identities of the CNAs that had been designated, not a request for comment on potential designation of the six organizations. ECF No. 24-2 at 37; ECF No. 34 at 10–12. Defendants' account is strongly supported by congressional testimony from the chair of the Committee at the time.

---

[9] Title 41 of the C.F.R. was reorganized and renumbered in 1959, resulting in the prior Part 301 becoming Part 51-1. Editorial Note, 24 Fed. Reg. 10952 (Dec. 30, 1959).

[10] The prior regulation relating to designation of the National Industries for the Blind was codified at 41 C.F.R. § 51-1.5, titled "Responsibilities of National Industries for the Blind." 41 C.F.R. § 51-1.5 (1972).

First, in testimony at a hearing on increasing the Committee's budget that was held on June 8, 1973 – two weeks before the final rule was published – Committee Chairman Vice Admiral Kenneth R. Wheeler stated that "[t]he committee has designated [the six organizations named in the rulemaking], together with the National Industries for the Blind, as the central nonprofit agencies with which it would deal in administering the expanded [JWOD] program." *To Increase 1974 Budget of Committee for Purchase of Products and Services of the Blind and Other Severely Handicapped: Hearing on H.R. 7423 Before a Subcomm. of the H. Comm. on Gov't Operations*, 93d Cong. 8 (1973) (statement of Vice Admiral Kenneth R. Wheeler, Chairman, Comm. for Purchase of Products and Services of the Blind and Other Severely Handicapped). Because the six organizations were struggling to "make the program fully effective," however, the Committee had been working with the organizations on proposals to increase their capabilities. *Id.* To that end, Vice Admiral Wheeler explained, the Committee had announced in January 1973 – two months before the proposed rule was published in March of that year – that it supported "the creation of a single operating agency, similar to the National Industries for the Blind, to assist all the workshops serving the other severely handicapped in implementing the program." *Id.* Moreover, by June, the Committee was "working with the six national agencies concerned to create this new single central nonprofit agency." *Id.*

Vice Admiral Wheeler's June 1973 testimony, particularly the statement that the Committee had endorsed moving to a single CNA for disabled workers in January 1973, reveals that the Committee had designated and begun working with the six new CNAs well before they were identified in the March 1973 proposed rule. *See id.* Testimony by Vice Admiral Wheeler's successor as Committee Chair at November 1973 hearings on the JWOD Act adds further clarity.

In his prepared remarks for the hearing, Chairman M.S. Meeker explained the history of the six

organizations' designation in more detail:

> Initially, the Committee decided not to designate one single central nonprofit
> agency to represent the handicapped other than the blind but rather to work with
> existing national agencies. The Committee sent letters to the major national
> agencies representing the other severely handicapped requesting a statement of
> their interest in fulfilling the role of a central nonprofit agency for their
> workshops. Six agencies indicated their desire to participate in this pilot program.
> These agencies were: [the six organizations named in the 1973 proposed and final
> rules]. The Committee designated these six agencies, together with the National
> Industries for the Blind, as the central nonprofit agencies with which it would deal
> in administering the expanded program.

*Amendments to the Wagner-O'Day Act: Hearings on H.R. 11143 Before a Subcomm. of the H.*

*Comm. On Gov't Operations*, 93d Cong. 12 (1973) (statement of M.S. Meeker, Chairman,

Comm. for Purchase of Products and Services of the Blind and Other Severely Handicapped).

Chairman Meeker also reiterated that in January 1973, after working in conjunction with the six

CNAs, the Committee had announced its support for the creation of a single CNA for disabled

workers. *Id.* While Chairman Meeker did not provide the date that the Committee had sent letters

to the six organizations eventually designated as CNAs, his testimony and his predecessor's

make clear that Defendants' account of the 1973 rulemakings is correct. The fact that the

Committee had announced support for creating a single organization in January 1973, after

already having worked with the six existing organizations to strengthen their capabilities,

confirms that the designations in the March 1973 proposed rule and June 1973 final rules were

merely formal publication of existing designations. Plaintiff's assertion that the 1973 rulemaking

was a notice and comment procedure for the designation of CNAs is therefore inaccurate.

Plaintiff also points to a 1976 rulemaking that it claims was another CNA designation

performed through notice and comment. Review of that rulemaking and the legislative and

regulatory actions surrounding it shows that Plaintiff is again mistaken. In July 1974, Congress

adopted legislation that modified the name of the Committee and its membership and funding. Act of July 25, 1974, Pub. L. No. 93-358, 88 Stat. 392. As Defendants note, the Committee then published amendments to its regulations in the Federal Register on October 1, 1974. ECF No. 34 at 11 (citing National Industries for the Severely Handicapped, 39 Fed. Reg. 35,364 (Oct. 1, 1974)). The preamble to the rule, which did not request comment and stated that the rule was effective upon issuance, explained that "[t]he enactment of [the July 1974 legislation], and the recognition of the National Industries for the Severely Handicapped as a central nonprofit agency requires certain revisions to the Committee regulations (38 FR 16316)." *Id.* at 35,364–65. One such revision was that "Sections 51–3.1(b), and 51–5.1–2(b) have been revised to add National Industries for the Severely Handicapped as a central nonprofit agency." *Id.* at 35,365. The language of the preamble, noting "the *recognition* of the National Industries for the Severely Handicapped as a central nonprofit agency" as a reason for the rulemaking, makes clear that neither the selection of NISH as a CNA nor its formal designation were conducted through notice and comment procedures. *Id.* at 35,364 (emphasis added).[11]

 Finally, in May 1976, the Committee published a proposed rule in the Federal Register to withdraw the designation of the six original CNAs for disabled workers. Workshops for the Other Severely Handicapped, 41 Fed. Reg. 21,359 (May 25, 1976). The preamble explained the purpose of the rulemaking:

> On October 1, 1974, the Committee designated the National Industries for the Severely Handicapped as a central nonprofit agency representing workshops serving the other severely handicapped. The National Industries for the Severely Handicapped was created to replace the six national organizations and eventually

---

[11] Hearing testimony from April 25, 1974 shows that NISH was created through a collaborative process between the Committee and the six existing CNAs. *See Purchases and Services from Blind and Other Severely Handicapped, 1974: Hearing on S. 2687 and H.R. 11143 Before the Subcomm. on the Handicapped of the S. Comm. on Labor & Pub. Welfare*, 93d Cong. 27–28 (1974) (statement of M.S. Meeker, Chairman, Comm. for Purchase of Products and Services of the Blind and Other Severely Handicapped); *see also id.* at 81–82 (statement of Charles L. Roberts, Executive Vice President, International Association of Rehabilitation Facilities) (explaining the process among the existing CNAs to form and obtain funding for NISH).

> to assume responsibility for representing all non-blind workshops. In the interim period since October 1, 1974, the Committee has continued to recognize the six other national organizations as central nonprofit agencies. Effective July 1, 1976, the central nonprofit agency functions for all non-blind workshops is being transferred exclusively to the National Industries for the Severely Handicapped and the designation of the six other national agencies as central nonprofit agencies in § 51–3.1 is being withdrawn.

*Id.* Notably, the preamble invited comments on the proposal. *Id.* at 21,360. Six days after the close of the comment period, the Committee published a final rule. Central Nonprofit Agency Functions for All Non-Blind Workshops, 41 Fed. Reg. 26,905 (June 30, 1976). Because no unfavorable comments were received, the agency adopted the changes in the proposed rule and withdrew the designation of the six original CNAs. *See id.*

While the 1976 rulemaking used notice and comment procedures, Plaintiff's argument that the Commission thereby set a policy precedent for future CNA designations is unpersuasive. In citing the 1976 rulemaking as support for its position, Plaintiff states that "the previous times that AbilityOne has designated new CNAs, it did so by issuing regulations after a full notice and comment process." ECF No. 17-1 at 18. The 1976 rulemaking, however, was not the designation of a new CNA, but rather the completion of a specific and unique process of transferring responsibilities from the six original CNAs to NISH, as the proposed rule explained. Workshops for the Other Severely Handicapped, 41 Fed. Reg. at 21,359. NISH had already been designated in 1974, however, an action that was taken without notice and comment. At best, the fact that notice and comment procedures were used for the 1976 rulemaking suggests that the removal of a CNA designation may require notice and comment. The 1976 rulemaking says little about the requirements for designation of new CNAs. In fact, to the extent that historical agency practice is relevant, the historical record shows that past designations have proceeded through informal discussions and cooperation between the agency and organizations that it seeks to designate as

CNAs. Therefore, Plaintiff's argument that "the Commission replaced its policy of designating CNAs through legislation and regulation with an informal procedure, thus establishing a change in policy that triggers the APA's rulemaking provisions," cannot prevail. ECF No. 30 at 40–41. Nor does the argument made in the Amended Complaint that the designation of AFB was itself a rulemaking. If historical practices and conduct are as instructive as Plaintiff maintains, the fact that prior designations were not treated as rulemakings is persuasive. Nor, as Defendants contend, does the designation of a CNA bear resemblance to the agency actions described in the APA's definitions of "rule" and "rule making" at 5 U.S.C. § 551. ECF No. 24-2 at 32 (citing 5 U.S.C. § 551(4), (5)). Plaintiff has failed to demonstrate that notice and comment procedures were required for the designation and July 2018 Agreement. The Court will therefore grant summary judgment to Defendants on the procedural APA claim.[12]

### 2. The Procurement Law Claim

Plaintiff's second claim, which the Court refers to as the procurement law claim, asserts that Defendants violated § 706(2)(A) of the APA by failing to comply with statutes and regulations governing federal procurements and awards in designating AFB and entering into the July 2018 Agreement. ECF No. 2 ¶¶ 79–82. Plaintiff makes two alternative arguments: either Defendants failed to adhere to a set of Office and Management and Budget guidance provisions codified at Part 200 of Title 2 of the Code of Federal Regulations known as the Uniform Administrative Requirements, Cost Principles, and Audit Requirements ("UAR"); or alternatively, Defendants violated federal procurement statutes codified in Title 41 of the U.S.

---

[12] Because Plaintiff's sole argument supporting this claim fails, the Court need not reach Defendants' alternative arguments that the designation and July 2018 Agreement are exempt from the notice and comment requirement under the exception at 5 U.S.C. § 553(a)(2) for any "matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts," either under the "agency management" or "contracts" provisions. *See* ECF No. 24–2 at 34–36; ECF No. 34 at 14–15.

Code and the set of federal procurement rules known as the Federal Acquisition Regulation ("FAR") codified in Title 48 of the Code of Federal Regulations. ECF No. 2 ¶¶ 80–82, 85–89, 90–95. Plaintiff also references the Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA"), 31 U.S.C. §§ 6301–6308, an additional source of federal procurement law that establishes a part of the legal framework on which Plaintiff relies. ECF No. 2 ¶ 84.

Reviewing the relevant provisions of the FGCAA is helpful to establishing the structure of the procurement law regimes at issue. § 6301 of the FGCAA identifies three types of legal instruments that the federal Government may use to form "relationship[s] between executive agencies and contractors, States, local governments, and other recipients in acquiring property and services and in providing United States Government assistance": procurement contracts, grant agreements, and cooperative agreements. 31 U.S.C. § 6301. The statute provides that agencies must use procurement contracts when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." *Id.* § 6303(1). A cooperative agreement is the required instrument when "(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." *Id.* § 6305; *see also COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 271 n.1 (4th Cir. 1999). Finally, a grant agreement is required when the "principal purpose" condition of a cooperative agreement is met, but "substantial involvement *is not* expected between the executive agency and

the State, local government, or other recipient when carrying out the activity contemplated in the agreement." 31 U.S.C. § 6304(2) (emphasis added).

The tripartite FGCAA framework informs the structure of the FAR, which with "its web of regulatory and associated statutory provisions govern[s] the acquisition by federal agencies of supplies and services." *Miller v. Clinton*, 687 F.3d 1332, 1347 (D.C. Cir. 2012). In its main definitions provision at 48 C.F.R. § 2.101, the FAR defines "contract" as "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them," and that "includes all types of commitments that obligate the Government to an expenditure of appropriated funds." 48 C.F.R. § 2.101. Importantly, however, "[c]ontracts do not include grants and cooperative agreements covered by 31 U.S.C. § 6301, *et seq.*" *Id.* The FAR definitions provision also defines "acquisition" as "the acquiring by *contract* with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease," and states that "procurement" has the same meaning. *Id.* (emphasis added). Explaining the FAR's scope, 48 C.F.R. § 1.104 provides that "[t]he FAR applies to all acquisitions as defined in part 2 of the FAR, except where expressly excluded." *Id.* § 1.104. By virtue of these interlocking definition provisions, the FAR applies only to acquisitions and procurements, and not to grants and cooperative agreements as those instruments are defined by the FGCAA. *See Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 452 (D.C. Cir. 1994).

Exempt from the FAR, cooperative agreements and grant agreements are instead addressed by the UAR, which "establishes uniform administrative requirements, cost principles, and audit requirements for Federal awards to non–Federal entities." 2 C.F.R. § 200.100(a)(1). "Federal awards" includes cooperative agreements and grants, but "does not include other

contracts that a Federal agency uses to buy goods or services from a contractor." *Id.* § 200.38(c);

*see id.* §§ 200.38(a), (b) (defining "Federal award"). Like the FAR, the UAR defines the types of

legal instruments within its scope by reference to their definitions under the FGCAA. First, a

"cooperative agreement" is

> a legal instrument of financial assistance between a Federal awarding agency or
> pass-through entity and a non–Federal entity that, consistent with 31 U.S.C.
> 6302–6305: (a) Is used to enter into a relationship the principal purpose of which
> is to transfer anything of value from the Federal awarding agency or pass-through
> entity to the non–Federal entity to carry out a public purpose authorized by a law
> of the United States (see 31 U.S.C. 6101(3)); and not to acquire property or
> services for the Federal government or pass-through entity's direct benefit or use;
> (b) Is distinguished from a grant in that it provides for substantial involvement
> between the Federal awarding agency or pass-through entity and the non–Federal
> entity in carrying out the activity contemplated by the Federal award.

2 C.F.R. § 200.24. A grant agreement is defined similarly, but "[i]s distinguished from a

cooperative agreement in that it does not provide for substantial involvement between the

Federal awarding agency or pass-through entity and the non–Federal entity in carrying out the

activity contemplated by the Federal award." *Id.* § 200.51(b).

Together, the FGCAA, the FAR, and the UAR define a federal procurement and award

regime composed of the three major categories of grant agreements, cooperative agreements, and

procurement contracts, the latter two of which are relevant here. Under the terms of the FAR,

procurement contracts are agreements that are the result of acquisitions or procurements, as those

terms are synonymously defined, and are subject to the FAR's requirements. As the U.S. Court

of Appeals for the Federal Circuit has explained, "[w]hen using a procurement contract, an

agency must adhere to federal procurement laws, including the Competition in Contracting Act

(CICA), 41 U.S.C. § 3301, as well the Federal Acquisition Regulation (FAR)." *CMS Contract*

*Mgmt. Servs. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1381 (Fed. Cir. 2014). In contrast,

"[w]hen using a cooperative agreement, agencies escape the requirements of federal procurement

law." *Id.* Cooperative agreements, as defined by § 6305 of the FGCAA and the provisions in the FAR and UAR that reference that definition, are subject instead to the UAR.

Returning to the claim at issue, Plaintiff maintains that the July 2018 Agreement is either a cooperative agreement subject to UAR provisions that require public notice and use of specific procedures for review of potential awards, or alternatively is a procurement contract that must comply with provisions of the FAR and associated statutes requiring public notice, competition, and other procedural steps. ECF No. 2 ¶¶ 48, 63–64, 80–82; ECF No. 17–1 at 20–24; ECF No. 30 at 41–44. Defendants respond that the FAR and its associated statutes are inapplicable because "the AFB designation as effectuated by way of the cooperative agreement" was not a procurement and does not involve a procurement contract. ECF No. 34 at 17–18; *see also* ECF No. 24-2 at 38–40, 43–45. Defendants do not contest that the July 2018 Agreement between the Commission and AFB is a cooperative agreement subject to the UAR, but maintain that the provisions Plaintiff alleges were violated are permissive rather than mandatory for non-competitive cooperative agreements. ECF No. 24-2 at 44–45; ECF No. 34 at 16–17. Upon careful review of the relevant provisions and applicable case law, the Court agrees that the designation of AFB as a CNA and the July 2018 Agreement are not subject to the FAR and federal procurement statutes, and further that Defendants did not violate the UAR.

Considering first the FAR, Plaintiff's argument can only succeed if the process of designating AFB and entering the July 2018 Agreement constitutes an acquisition or procurement within the meaning of the FAR, as those terms are synonymously defined at 48 C.F.R. § 2.101. For several reasons, the Court concludes that it does not. As described previously, an "acquisition," the only type of instrument subject to the FAR per 48 C.F.R. § 1.104, is "the acquiring by contract with appropriated funds of supplies or services (including

construction) by and for the use of the Federal Government through purchase or lease." 48

C.F.R. § 2.101. A "contract" under the FAR is "a mutually binding legal relationship obligating

the seller to furnish the supplies or services (including construction) and the buyer to pay for

them." *Id.* The relationship between the Commission and AFB is plainly not one of buyer and

seller. As the terms of the July 2018 Agreement state, the Commission is not purchasing services

from AFB, and AFB is not paid or otherwise compensated by the Commission. Once it

completes the initial phases of the Agreement, AFB will be paid in the form of the Program Fees

that 41 C.F.R. § 51-3.5 and the Agreement authorize it to collect from the NPAs whose contracts

it will manage. The Program Fees are AFB's sole source of revenue in its role as a CNA, as the

July 2018 Agreement states:

> The CNA agrees to accept Program Fee payments from third party qualified
> NPAs as full consideration in accordance with the terms and conditions of this
> agreement, the provisions of the Javits-Wagner-O'Day Act and the regulations
> and policies issued by the Commission. The CNA waives the right to collect
> Program Fee [sic] from the Commission.

ECF No. 17-2 at 42. No other provision of the July 2018 Agreement obligates the Commission to

pay AFB for any "supplies or services." 48 C.F.R. § 2.101. Therefore, because the Commission

is not a "buyer" and AFB is not a "seller," the designation and July 2018 Agreement cannot

constitute a "contract," and in turn cannot be the subject of an "acquisition" or "procurement"

subject to the FAR. *Id.*

The limited but instructive case law addressing the scope of the FAR and federal

procurement law in similar contexts supports this conclusion. In *Grigsby Brandford & Co., Inc.*

*v. United States*, two financial firms challenged the U.S. Department of Education's selection of

a different firm to serve as the Designated Bonding Authority ("DBA") for the Department's

Historically Black Colleges and Universities Capital Financing Program. 869 F. Supp. 984, 986–

87 (D.D.C. 1994). The DBA position was created by the statutes establishing the Program, which directed the Department to select a non-government entity to "issue bonds and lend the proceeds to eligible institutions for capital improvements projects," among a variety of other significant responsibilities supporting development and execution of the Program. *Id.* at 987. Plaintiffs in the case alleged that the Department's process for selecting the DBA had violated the Competition in Contracting Act and the FAR. *Id.* at 997. The court disagreed, stating that "it is well settled that federal procurement laws and regulations, such as CICA and the FAR, apply only when an agency, such as the Department of Education, acts as a commercial purchaser of goods and services." *Id.* The court explained that in selecting a DBA, the Department was not acting as a commercial purchaser, but rather was "conferring a status upon a private entity." *Id.* at 998–99. "There are no deliverable goods or services implicated in the statute's provision for selection of a DBA," the court reasoned. *Id.* at 998. "Rather, the outcome of the selection process is the designation of a bonding authority defined as a 'private, for-profit corporation selected ... for the purpose of issuing taxable construction bonds in furtherance' of the goal of the HBCU Capital Financing Program, to facilitate capital investment opportunities for historically Black colleges and universities." *Id.* (quoting 20 U.S.C. § 1132c-1(8)).

The same reasoning applies here. There are no deliverable goods or services involved in the CNA role, and the Commission did not act as a commercial purchaser in designating AFB. The Commission instead selected a new CNA in furtherance of the purpose of its statutory designation authority: "to facilitate the distribution . . . of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled." 41 U.S.C. § 8503(c). Under the reasoning of *Grigsby Brandford*, the FAR does not apply to AFB's designation. Plaintiff contests

this conclusion, insisting that the Commission's "solicitation" of AFB was a "commercial transaction[]" and quoting language from *Grigsby Brandford* stating that "[w]hat governs is the nature of the relationship created by the selection . . . ." ECF No. 30 at 43–44 (quoting 869 F. Supp. at 998). To suggest that the relationship between the Commission and AFB is commercial, Plaintiff points to the fact that Commission regulations authorize CNAs to also act as prime contractors. *Id.* at 44 (citing 41 C.F.R. § 51-3.2(k)). The text of the July 2018 Agreement, however, shows that AFB's ability to act as a prime contractor is narrowly circumscribed and exists only in rare situations when the Commission gives prior approval. *See* ECF No. 17-2 at 37–38. The Commission's designation of AFB has little to do with the possibility of AFB serving in a commercial contractor role. Plaintiff's argument therefore fails.

Case law from the U.S. Court of Appeals for the Federal Circuit that applies the FGCAA's definitions of "procurement contract" and "cooperative agreement" further strengthens the conclusion that procurement law does not apply to AFB's designation. In *Hymas v. United States*, a farmer challenged the U.S. Fish and Wildlife Service's non-competitive process for selecting farmers to grow crops on certain public refuge lands under "cooperative farming agreements" or "CFAs." 810 F.3d 1312, 1314 (Fed. Cir. 2016). The CFAs were created to implement federal conservation statutes by permitting cooperating farmers to grow certain crops on the public lands and retain 75 percent of the yield while leaving 25 percent to feed migratory birds and other wildlife. *Id.* at 1315. The plaintiff, who had sought to secure a CFA but was denied, argued that the agreements were procurement contracts under § 6303 of the FGCAA rather than cooperative agreements under § 6305, and therefore were subject to procurement laws requiring open competition. *Id.* at 1316. After noting that "[w]hether a contract is a procurement contract or a cooperative agreement is a question of law," the court disagreed with

the plaintiff, concluding that under the FGCAA's definitions of the two instruments, the CFAs qualified as cooperative agreements. *Id.* at 1324, 1327–29 (quoting *CMS Contract Mgmt. Servs.*, 745 F.3d at 1381).

"Under the FGCAA," the *Hymas* court explained, "whether an instrument reflects a 'procurement contract' or a 'cooperative agreement' turns upon the principal purpose of the relationship.'" *Id.* at 1327. Quoting the FGCAA's definition of cooperative agreement, the Court explained that

> If the Service principally intended to "transfer a thing of value" to the private farmers "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit of or use of the United States Government," then the instrument is a cooperative agreement. 31 U.S.C. § 6305(1). The Service must also remain "substantial[ly] involve[d]" in the activity. *Id.* § 6305(2).

*Id.* at 1327. Those conditions were met, the court held, because "the Service principally intended the CFAs to transfer a thing of value (i.e., the right to farm specific refuge lands and retain a share of the crop yield) to carry out a public purpose authorized by law (i.e., to conserve wildlife on the refuges)." *Id.* The Service also "remains substantially involved in the activity, advising on decisions related to crop selection, farming methods, pesticide and fertilizer use, and crop harvest." *Id.* at 1328. Moreover, "the agency did not intend to acquire farming 'services' for the 'direct benefit or use of the United States Government.'" *Id.* (quoting 31 U.S.C. § 6305(1)). While the CFAs did "indirectly benefit the Service since the private farmers' activities advance the agency's overall mission," the court explained, "that is true for nearly all cooperative agreements." *Id.* "More importantly, the Service does not directly benefit from the farming services pursuant to the CFAs because . . . it does not receive payment from the farmers pursuant to the agreements," nor did it take possession of any portions of the crops the farmers grew. *Id.*

*Hymas*'s analysis of the Fish and Wildlife Service's CFAs applies well to the relationship at issue here. As the July 2018 Agreement states and Defendants describe, the Commission's principal intent with the Agreement was to transfer to AFB a thing of value – the right to manage and expand a multimillion-dollar program of federal contracting that furthers AFB's mission – in part to carry out purposes directed by § 8503(e) of the JWOD Act. *See* ECF No. 17-2 at 7; ECF No. 24-2 at 32–33. That provision authorizes the Commission to continually study and evaluate its activities, including with assistance from non-government groups, and to examine problems related to employment of the blind and other severely disabled individuals, and potential production methods, in order to enable increased employment. *See* 41 U.S.C. § 8503(e); *see also* ECF No. 17-2 at 7. According to the July 2018 Agreement and materials in the Administrative Record, those purposes animated the Commission's decision to establish an agreement that "provides a framework for a new CNA model in the AbilityOne Program that places the focus on increasing job placement and career advancement opportunities in knowledge-based positions." ECF No. 17-2 at 2, 7; ECF No. 26-3 at 2–4, 9; ECF No. 24-2 at 32–33 ("The CNA designation was a means of directly reinforcing the JWOD Act's priorities of continuing to evaluate the effectiveness of AbilityOne's mission and engaging in continuing studies of issues connected to the employment of the blind and other severely disabled persons.").

Further, as in *Hymas*, the Commission "did not intend to acquire . . . 'services' for the 'direct benefit or use of the United States Government.'" *Hymas*, 810 F.3d at 1328 (quoting 31 U.S.C. § 6305(1)). While the July 2018 Agreement "indirectly benefit[s] the [Commission]" because AFB's CNA activities "advance the agency's overall mission," the Commission did not acquire services for the government's direct benefit or use. *Id.* Instead, the Commission entered an agreement with AFB to benefit the greater blind community by developing a new CNA

framework "that places the focus on increasing job placement and career advancement opportunities in knowledge-based positions," consistent with the statutory authorizations at § 8503(e). ECF No. 17-2 at 2. In other words, the Commission designated AFB "to carry out a public purpose of support or stimulation authorized by a law of the United States." 31 U.S.C. § 6305(1). And certainly "substantial involvement is expected between the [Commission] and [AFB] when carrying out the activity contemplated in the agreement," *id.* § 6305(2), as the Commission evaluates AFB's progress at Phase I of its designation, conducts detailed reviews of its capabilities and determines whether to approves it as a CNA in Phase II, and cooperates with it at Phase III as a "fully functioning" CNA. ECF No. 17-2 at 7, 30, 41–42, 51–52. Therefore, with all elements of the FGCAA definition satisfied, the July 2018 Agreement meets the elements of a cooperative agreement. The Court therefore concludes that the July 2018 Agreement does not qualify as a procurement contract under the terms of the FGCAA and is not subject to the FAR.

A final note on federal procurement law is necessary before turning to the UAR. In the Amended Complaint and subsequent submissions, Plaintiff asserts that Defendants violated 41 U.S.C. § 1708, a provision of the Office of Federal Procurement Policy Act that requires agencies to publish notices of procurement solicitations, allow for reasonable time to respond, and consider submissions.[13] ECF No. 2 ¶¶ 48, 81, 92–94; ECF No. 17-1 at 15, 21–23. Specifically, Plaintiff asserts that Defendants violated § 1708(a)(2) "by entering into a

---

[13] The Amended Complaint also mentions 41 U.S.C. §§ 3301 and 3306, sections of the Competition in Contracting Act of 1984 (CICA) that require agencies to allow open competition for procurement and to solicit and accept bids consistent with that guideline. Although the Amended Complaint identifies the two sections in the heading of its fourth cause of action in addition to § 1708, it discusses only § 1708 in the body of the count. ECF No. 2 at 20–21. Defendants have addressed only § 1708 in their filings. To the extent that Plaintiff asserts a violation of the CICA, the Court concludes, consistent with *Grigsby Brandford*'s holding that "it is well settled that federal procurement laws and regulations, such as CICA and the FAR, apply only when an agency . . . acts as a commercial purchaser of goods and services," that the CICA does not apply to the designation and July 2018 Agreement for the same doctrinal reasons that they are not subject to the FAR. 869 F. Supp. at 997.

cooperative agreement with AFB without first publishing a presolicitation notice or notice of solicitation for proposals, or soliciting bids"; § 1708(e) "by entering into a cooperative agreement with AFB without providing a reasonable period to respond to the notice of solicitation"; and § 1708(f) "by entering into a cooperative agreement with AFB before first considering other responsive and timely offers received in response to a notice of solicitation." ECF No. 2 ¶¶ 92–94. Plaintiff's claim fails because Plaintiff has misread § 1708.

§ 1708(a)(2) requires that "an executive agency shall publish a notice of solicitation described in subsection (c) if the agency intends to– (A) solicit bids or proposals for a contract for property or services for a price expected to exceed $25,000; or (B) place an order, expected to exceed $25,000, under a basic agreement, basic ordering agreement, or similar arrangement." 41 U.S.C. § 1708(a)(2). Plaintiff appears to be alleging that the Commission violated § 1708(a)(2)(A) because "Federal Procurement law requires any federal agency intending to enter into a contract exceeding $25,000 to publish a notice of solicitation." ECF No. 2 ¶ 58. But that is not what the statute says; instead, the notice requirement only applies "*if the agency intends to . . . solicit bids or proposals*." 41 U.S.C. §§ 1708(a)(2) (emphasis added). It is undisputed that the Commission did not so intend. § 1708(a)(2) therefore does not apply to the designation of AFB and the July 2018 Agreement.

Nor do the two other provisions that Plaintiff claims were violated. § 1708(e) provides that "[a]n executive agency required by subsection (a)(2) to publish a notice of solicitation may not," among other requirements, "issue the solicitation earlier than 15 days after the date on which the notice is published." Because § 1708(a)(2) imposes no requirements on the Commission here, § 1708(e) does not apply. The final provision Plaintiff points to, § 1708(f), states that "[a]n executive agency intending to solicit offers for a contract for which a notice of

solicitation is required to be posted under subsection (a)(1) shall ensure that contracting officers consider each responsive offer timely received from an offeror." Plaintiff does not claim that the designation and July 2018 Agreement are subject to § 1708(a)(1), nor did the Commission intend to solicit offers for a contract. Therefore, § 1708(f) does not apply, and Plaintiff's claims that Defendants have violated § 1708 must fail. The Court thus concludes that neither the FAR nor the procurement law statutes that Plaintiff has cited apply to the designation and July 2018 Agreement.

Plaintiff's claims under the UAR fare no better. Plaintiff alleges that with the designation and July 2018 Agreement, Defendants violated 2 C.F.R. §§ 200.203, 200.204, 200.205(b), and 200.211(a). ECF No. 2 ¶¶ 85–89. These provisions of the UAR are contained in a subpart titled Pre-Federal Award Requirements and Contents of Federal Awards. § 200.203 states that "[f]or competitive grants and cooperative agreements, the Federal awarding agency must announce specific funding opportunities by providing [certain] information in a public notice." § 200.204 requires that "[f]or competitive grants or cooperative agreements, unless prohibited by Federal statute, the Federal awarding agency must design and execute a merit review process for applications." § 200.205(b) provides that "for competitive grants or cooperative agreements, the Federal awarding agency must have in place a framework for evaluating the risks posed by applicants before they receive Federal awards." Except in summarizing Plaintiff's allegations, Defendants' filings address only §§ 200.203, 200.204, 200.205(b), which the Court will consider first before turning to § 200.211(a).

While they do not contest that cooperative agreements are subject to the UAR, Defendants maintain that §§ 200.203, 200.204, and 200.205 are inapplicable to the designation and July 2018 Agreement because another provision, § 200.200(b), provides an exemption. ECF

No. 24-2 at 44–45; ECF No. 34 at 16–17.[14] § 200.200(b) states, in language that includes the titles of the provisions that it discusses after their citations, that

> Use of §§ 200.203 Notices of funding opportunities, 200.204 Federal awarding agency review of merit of proposals, 200.205 Federal awarding agency review of risk posed by applicants, and 200.207 Specific conditions, is required only for *competitive* Federal awards, but may also be used by the Federal awarding agency for *non-competitive* awards where appropriate or where required by Federal statute.

2 C.F.R. § 200.200(b) (emphasis added). This provision makes clear that there is a distinction between "competitive" and "non-competitive" awards in the UAR regime. Moreover, § 200.200(b) explicitly exempts the category of "non-competitive awards" from the mandatory requirements of §§ 200.203, 200.204, and 200.205, and leaves use of those procedures as a matter of discretion for the awarding agency. Therefore, unless the designation and July 2018 Agreement fall into the "competitive" awards category, the requirements of those three sections do not apply. This conclusion is underscored by the text of the three provisions themselves, all of which begin with the limiting language "[f]or competitive grants and cooperative agreements" or "for competitive grants or cooperative agreements."[15]

Plaintiff responds that this conclusion is incorrect because § 200.101(b) of the UAR "provides that Subparts C and D (including §§ 200.200–200.345) apply to all 'grant agreements

---

[14] Defendants separately appear to suggest that like the FAR, the UAR only applies to "commercial procurement[s]." ECF No. 24-2 at 38, 44. Plaintiff correctly observes that Defendants have provided no support for the extension of this principle to the UAR, ECF No. 30 at 42, and Defendants' Reply to Plaintiff's Opposition appears to concede that any allusion to that effect in Defendants' earlier submission was accidental. *See* ECF No. 34 at 16 ("To clarify, there is no dispute that cooperative agreements are subject to the UAR"). The Court therefore considers this argument to be abandoned.

[15] While there is perhaps a question whether "competitive" modifies "cooperative agreements" as well as "grants" in these provisions, the Court will apply the "series-qualifier canon" of interpretation and conclude that it does. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147–48 (2012) (stating the canon that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series"); *see also Lewis v. Jackson Energy Coop. Corp.*, 189 S.W.3d 87, 92 (Ky. 2005) (explaining that "the first adjective in a series of nouns or phrases modifies each noun or phrase in the following series unless another adjective appears"); *Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952).

and cooperative agreements,' without limitation to 'competitive' or 'commercial' agreements."
ECF No. 30 at 42 (quoting 2 C.F.R. § 200.101(b)(1)). That provision provides no support for
Plaintiff's position, however. The portion of § 200.101(b)(1) that Plaintiff relies on is a table
identifying the types of awards subject to the different subparts of the UAR that indeed lists
"grants and cooperative agreements" as subject to the provisions of "Subparts C-D" with
exceptions not relevant here. But that general provision does not purport to override the specific
language in § 200.200(b) exempting non-competitive awards from the mandatory procedures of
§§ 200.203, 200.204, and 200.205, nor the language of each of those provisions limiting their
requirements to competitive awards. Plaintiff further claims that exceptions listed at §
200.101(d)-(e) are the only exceptions from provisions of §§ 200.203, 200.204, and 200.205,
ECF No. 30 at 42–43, but that argument again overlooks and fails to grapple with the explicit
limiting language within those sections and the broad exception for non-competitive awards at §
200.200(b).

Though Plaintiff's arguments about the meaning of the relevant UAR provisions cannot
succeed, Plaintiff could still prevail if it could show that the designation and July 2018
Agreement constitute a "competitive" federal award that would not be exempted from
§§200.203, 200.204, and 200.205. But Plaintiff has not done so. As Defendants observe, neither
the JWOD Act nor any other enactment imposes a statutory requirement on the Commission to
use competitive procedures in designating CNAs. ECF No. 34 at 17. Nor do any of the UAR
provisions that Plaintiff points to mandate competitive procedures. Instead, the UAR sets out
procedures that apply to competitive cooperative agreements without addressing when such
agreements may or must be used, indicating that an external source of law controls whether an
agency must use competitive procedures. Plaintiff has pointed to no such authority that applies to

45

the Commission and the Court is aware of none. Therefore, in the absence of any requirement to use competitive procedures, the Court agrees with Defendants that that decision is left to the Commission's discretion. *See id.* Plaintiff protests that that conclusion cannot be correct because it "would mean that an agency may simply decide to opt out of the regulatory notice and competition requirements by deciding it prefers not to seek competitive bids." ECF No. 30 at 42. While that outcome may be frustrating to Plaintiff as a matter of policy, it is immaterial to the question before the Court, which is answered by the plain text of the UAR.

A similar failure to identify statutory or other obligations that are imposed on the Commission, if any, also dooms Plaintiff's claim that Defendants violated § 200.211(a). That provision states that "[i]n accordance with statutory requirements for Federal spending transparency (e.g., FFATA), except as noted in this section, for applicable Federal awards the Federal awarding agency must announce all Federal awards publicly and publish the required information on a publicly available OMB–designated governmentwide Web site (at time of publication, www.USAspending.gov)." Per the definitions provision of the UAR, 2 C.F.R. § 200.0, FFATA refers to the Federal Funding Accountability and Transparency Act of 2006, Pub. L. No. 109-282, 120 Stat. 1186. Codified as amended at 31 U.S.C. § 6101 note, FFATA's primary operative provision directs the Office of Management and Budget ("OMB") to "ensure the existence and operation of a single searchable website, accessible by the public at no cost to access, that includes [certain information] for each Federal award." 31 U.S.C. § 6101 note. The Act imposes no obligations on agencies related to the website except to participate in its development and operation if requested by OMB. *See id.* § 200.211(a) does not identify any other "statutory requirements for Federal spending transparency" besides FFATA, nor has Plaintiff. Further, Plaintiff has not identified what statute or other source of authority renders the

designation and July 2018 Agreement an "applicable Federal award[]" that must be announced and published on an OMB website under the terms of § 200.211(a). For these reasons, the Court finds that there are insufficient grounds to conclude that Defendants have violated § 200.211(a). Having found no violation of federal procurement statutes, the FAR, or the UAR, the Court will grant summary judgment to Defendants on the procurement law claim.

### 3. The Substantive APA Claim

The Court finally turns to Plaintiff's claim that the designation of AFB and the July 2018 Agreement violate the APA because, as alleged in the Amended Complaint, "the Commission has provided no rationale for its selection of AFB and no rationale for its selection of AFB without soliciting or considering other bids by more qualified applicants." ECF No. 2 ¶ 83. With the benefit of the Administrative Record, which Defendants filed shortly after submitting their pending motion, Plaintiff expands the scope of this claim, arguing in its Opposition to Defendants' motion that "the Commission acted arbitrarily and capriciously in ignoring its own internal evaluation of AFB and waiving the standards it admits all CNAs must meet to justify designating AFB as a new CNA." ECF No. 30 at 37 (internal quotation marks omitted). Plaintiff further contends that "had the Commission followed the UAR, the FAR, or its own CNA qualification standards, AFB would not have been a qualified CNA," and asserts that "the Administrative Record is rife with examples of the Commission's departure from its own standards to justify AFB's designation." *Id.* at 45–46. The Court has already found that the FAR is inapplicable and that the designation did not violate the UAR, but has also determined that the Commission's regulations establishing the duties of CNAs provide a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. After reviewing the record, however, the Court concludes that while the Commission's process was not a model of exemplary agency decisionmaking, the agency did not act unlawfully.

According to the Administrative Record, the process of designating AFB as a new CNA began in or before 2016. *See* ECF No. 26-3 at 3. Reacting to challenges including persistently high unemployment of people who are blind or severely disabled, increasing revenue for the existing CNAs without corresponding employment growth, and changes in federal contracting procedure without corresponding adjustments to the AbilityOne Program, the Chair of the Commission formed an Executive Subcommittee to recommend responsive action. *Id.*; *see also id.* at 42, 49–50. In 2016, the Executive Subcommittee instructed the Commission's Executive Director to explore and propose designation of a new CNA, with the goal of increasing employment by changing "the functional dynamics of the program." *Id.* at 3; *see also id.* at 42. Recognizing that NPAs employing blind workers "had not created any new job lines of business or developed any new and innovative approaches to increasing blind employment opportunities," the Commission "consulted with subject matter experts with extensive experience with nonprofit agencies and the blind community." *Id.* at 42. "[B]ased on the information provided by the subject matter experts the Commission determined that American Foundation for the Blind (AFB) would be the most qualified nonprofit agency to serve as Central Nonprofit Agency (CNA)" as part of the new initiative directed by the Subcommittee. *Id.* at 42–43.

Commission staff then began outreach to AFB. On December 9, 2016, Commission Executive Director Tina Ballard, Deputy Executive Director Kimberly Zeich, and Senior Advisor Brian Hoey met with AFB CEO Kirk Adams and HR Head Sonja Shiflet in Philadelphia to "(1) hold an initial discussion about the Commission's interest in designating a new CNA with a focus on innovation, and (2) ask AFB to consider the potential for becoming that new CNA." *Id.* at 55. The parties agreed to meet again "if AFB was interested in pursuing the idea." *Id.* at 56. Ballard, Zeich, and Hoey then met with Adams and Shiflet again in Arlington, Virginia on

February 27, 2017 to further discuss the CNA designation process, including the potential of a "phased approach." *Id.* On August 30 and August 31, 2017, Commission staff met with AFB representatives again to further discuss a "phased approach to establishing" a new CNA, "including associated milestones."[16] *Id.*; *see also id.* at 179. Another meeting with the same parties on October 19, 2017 discussed the "financial aspects of establishing a CNA" and "the potential content and structure of an agreement between the Commission and a new CNA"; an additional meeting was held on November 16, 2017. *Id.* at 56, 140. Hoey met further with AFB staff on two occasions in 2018 "to work through the strategy of becoming a new CNA." *Id.* at 56.

Commission staff also worked internally during the fall of 2017 to develop a "new Cooperative Agreement (CA) Framework" to be used for "new CNAs," and a Request for Proposal document for new CNAs that included a "draft requirements document" based on the new framework. *Id.* at 118, 141. A draft of the RFP was provided to Commission leadership in October and November 2017 by a "technical evaluation team" ("TET"), though the team stated in an internal memorandum that its members were excluded from meetings concerning further development of the RFP after November 28, 2017. *Id.* at 118. Nonetheless, the RFP was issued to AFB on February 13, 2018 with a return deadline of March 31, 2018. *Id.* at 43, 139. On April 4, 2018, the TET was "reengaged by leadership . . . in order to conduct evaluation" of AFB's submission. *Id.* at 118, 139. The TET reported some concerns with the issued RFP, including that it did not match typical requirements for RFPs in ways that "put[] the offeror at a disadvantage" and "make[] the technical evaluation process difficult," and contained some "[v]ague evaluation criteria" and no "requirements document" of the kind that the TET had included in the initial

---

[16] Also present at the meeting were representatives from the American Freedom Foundation, who the Commission had engaged to discuss becoming a new CNA focused on employing veterans. ECF No. 26-3 at 56. That effort was later abandoned. *Id.*

draft provided to Commission leadership. *Id.* at 118–20. The TET also noted a mismatch between the "deliverables" identified in the RFP and "the actual scope of the work [AFB] will perform to provide value to the Agency," which the RFP identified as "research studies and evaluation for the purposes of identifying those organizational infrastructure changes that might be required for a nonprofit entity to make in order to demonstrate to the commission that such entity could perform as a designated Central Nonprofit Agency." *Id.* at 120–21. The TET expressed further concerns that "the Government [cannot] know if they are getting what they need from the offeror(s) at the appropriate standard of acceptability if it was not articulated in the RFP," among other concerns. *Id.* at 121.

Because of these and other "omissions" in the RFP, the TET conducted research to determine if any legal authorities or agency policies identified minimum requirements to be designated as a CNA for the TET to use in evaluating AFB's submission. *Id.* at 121–22. Finding none, and unable to obtain "answers to questions posed to leadership requesting clarity on the requirement, the overall process leading up to and after solicitation, and proposal receipt," the team developed its own evaluation methodology based on the details and expectations established for offerors in multiple sections of the RFP. *Id.* at 122. Applying these criteria, the TET found numerous issues with AFB's proposal. First, with respect to AFB's proposed technical approach, some statements by AFB gave "the impression the offeror has low confidence in their own ability to provide definitive deliverables and actionable results on the scope of work within the period of performance allotted" and "will rely heavily on the Commission in order to perform." *Id.* at 124. Further, AFB had only described the information it would need "to develop the process [for increasing employment among the blind that] the Agency requires in the RFP," not the steps it would take to develop that process. *Id.* at 125. The

TET also found that the timeline AFB proposed for certain activities "does not appear realistic," that the activities discussed did not match with the RFP's requirements, that a proposal for developing metrics showed that AFB "appears to have difficulty presenting a cohesive approach," and that AFB had failed to discuss "statutory, legislative, or regulatory obstacles that could impact employment," as required by the RFP. *Id.* at 126–27. Additionally, in a section of the RFP relating to developing training materials for NPAs engaging in federal contracting, "terminology used within the offeror's key activities showcases a deficiency and lack of understanding on how to properly build a training program." *Id.* at 128.

In evaluating AFB's description of its financial health, the TET found that AFB had used unprovided data to support assumptions about its financial stability after the first year of CNA status. *Id.* at 130. Additionally, AFB discussed no financial risk mitigation strategies to use if it were unable to raise the funds it expected to by increasing donations and grants, an omission that concerned the TET because AFB was "showing an earned income loss from years 1-3 and projecting that philanthropic efforts will offset the loss." *Id.* at 130–31. Further, AFB's balance sheet showed that its "other sources of revenue . . . are minimum and cannot sustain the agency," particularly because AFB was proposing to share revenue with the NPAs whose contracts it would be administering and to offer financial rewards to NPAs for complying with certain AbilityOne Program requirements. *Id.* at 131–32. Finally, the TET evaluated AFB's potential to perform CNA responsibilities based on its descriptions of its work on three past projects. The TET concluded that the descriptions of several components of AFB's work on the projects were inadequate, that only one of the projects was relevant to potential performance as a CNA, and that none of the work AFB conducted on any of the projects gave any confidence that AFB "is capable of performing" as a CNA. *Id.* at 132–38.

On April 12, 2018, the TET delivered its evaluation of the RFP submission in a "memorandum for record" ("April 12 MFR") to the Commission's "Agreements Officer," and was informed that it was submitted to the Executive Director. *Id.* at 112, 118. According to an "Award Decision Document" signed on June 14, 2018 by Shelly Hammond, the Commission's Director of Contracting and Policy, AFB's submission underwent an additional review on April 18. *Id.* at 43. On April 30, 2018, however, the RFP was cancelled. *Id.* Hammond's memorandum states that while the Commission had "initially decided on a no-cost contract . . . in order to establish a formal relationship between the Commission and AFB . . . [a]fter further review and discussions with legal counsel we determined that a Phase-In approach Cooperative Agreement would be in the Commission's best interest." *Id.* A draft cooperative agreement was then issued to AFB on May 14, 2018 and a final draft was completed on May 31. *Id.* The next step in the progress of the designation was a memorandum dated June 7, 2018 that appears to primarily discuss NIB, the incumbent CNA, but which also partially discusses AFB and the "Decision Document" to be presented to the Commission members to vote on AFB's designation. *Id.* at 114–17. The author of the memorandum, whose name is redacted, stated opposition to including "any NIB related information in the decision document as it is not related to the capability, qualifications, nor financial stability of AFB," and "gives the appearance that we are using NIB's shortcomings to defend the designation of AFB." *Id.* at 117.

On June 11, four days later, the author of the June 7 memorandum produced an additional "Memorandum for Record" ("June 11 MFR") expressing significant concerns about AFB's designation. The author noted that the memorandum was written "[p]er the Chief of Staff and Executive Director's request . . . to provide a detailed justification for the positions articulated" with respect to AFB in the June 7 memo. *Id.* at 112. The author then explained that "[m]y

positions are justified by information stated" in the April 12 MFR, and that the author had "further stated my position in the May 1 Senior Staff meeting along with other members of the technical evaluation team." *Id.* "[A]s a result of the Senior Staff discussion, the Executive Director recommended the Agreements Officer cancel the RFP issued to AFB and to begin working on a 3 Phased Cooperative Agreement, in which AFB would be required to submit a revised proposal to meet requirements identified in the Agreement." *Id.* The author also expressed concerns that AFB had not been adequately vetted, and that following the new request, AFB had "submitted a number of questions that clearly reflected they have a completely different understanding of who is responsible for the execution of requirements within the Cooperative Agreement, to include some Phase I requirements for research and studies." *Id.* AFB was relying too heavily on its historical achievements rather than present capabilities, the author asserted, though its staff "has been very transparent regarding their limited personnel and funding resources." *Id.* The author concluded that "the proposed staffing levels" that AFB submitted in its response to the final cooperative agreement "would not be [sufficient to] execute any aspect of the [agreement], to include Phase I." *Id.* at 112–13.

Two days later, in a memorandum dated June 13, 2018, Commission General Counsel Timi Nickerson Kenealy reviewed the results of a "preliminary effort of the U.S. AbilityOne Commission General Counsel to conduct due diligence" for AFB's designation that she performed between June 7 and June 13. *Id.* at 71. The memorandum evaluated AFB using the criteria of "image and motivation," "social and environmental responsibility," and "financial soundness," which are "[t]hree common elements for conducting a due diligence review." *Id.* at 72. The function of the review was to "avoid conflicts of interest or the appearance of a conflict of interest" and to "protect the agency's reputation." *Id.* As source material for the review,

Nickerson Kenealy reviewed documents provided by AFB and information on its website, information in a federal award database, "general searches conducted on the Google search engine as well as for ratings of nonprofit entities on other websites," and "current pending cases in the PACER system." *Id.* at 73. Footnotes conceded that no research was conducted "into any of AFB's partners or pending business before other federal agencies," nor into any cases pending in state courts in New York, AFB's state of incorporation and domicile. *Id.* at 73 n.2–3.

In assessing AFB's "image and motivation," the review found "no adverse information about its public image or its role in the disability community," but conceded that "it is not known if there are any tensions between the community and AFB." *Id.* at 74. Considering AFB's capacity to perform as a CNA, the review described AFB's past work promoting "assistive technology." *Id.* It admitted, however, that "[i]t is not clear how AFB intends to leverage its ability to promote information about assistive technology to translate to innovations in the workplace and rehabilitative training for people who are visually impaired, but we expect that the research AFB conducts during Phase I will provide that information and business plan." *Id.* Under "social and environmental responsibility," the review produced no negative information, though the memorandum conceded that "the due diligence research has not specifically focused on corporate social responsibility," nor was the Commission "aware of any of AFB's labor practices" and policies. *Id.* at 75. The memorandum also stated that "[a] search for pending administrative or regulatory matters [involving AFB] has not been concluded," nor had a search of a federal contracting database. *Id.* Turning to AFB's financial soundness, the memorandum reported that AFB showed a loss of $3,960,296 on its 2016 Form 990. *Id.* at 76. AFB also reported holding unrestricted net assets of $16,004,817 and restricted assets of $12,299,455, but "did not provide any explanation of any of the restrictions placed on any of its assets by donors,

so there is no way to determine as of the date of this memorandum whether AFB would have access to any of these restricted assets as a potential CNA." *Id.* The memorandum also noted that "AFB has not yet provided the Commission with the premise for its business model that it intends to implement as the new AbilityOne CNA, so it is premature and not possible at this time to assess AFB's financial status with respect to its ability to contribute to the success of performance as a CNA." *Id.* at 77.

Finally, the memorandum described AFB's potential "[e]xemption [f]rom CNA [s]tandards and [r]esponsibilities." *Id.* at 77. The memorandum first noted that "[t]he Commission has set forth standards that central nonprofit agencies must meet at 41 C.F.R. §51-1.3." *Id.* It then listed the requirements of that provision, including the obligation to "[m]eet CNA [r]esponsibilities under the AbilityOne Program set out at 41 CFR §51-3.2," several of which it then enumerated as well. *Id.* The memorandum then stated, however, that "[i]n January 2017, the Commission adopted . . . additional CNA Standards," and listed nine such items, including "[b]usiness size," "[b]oard governance," "[e]xperience working with the Javits-Wagner-O'Day (JWOD) Act," "[c]omprehensive training program," "[p]roven past performance," and "[a]bility to assist nonprofit agencies with audit, oversight, and contract negotiations." *Id.* at 78. Though the memorandum listed these multiple sets of requirements for CNAs, it did not discuss AFB's ability to meet them, noting only that "the Commission has been asked to exempt AFB from applicability of the CNA standards and responsibilities set forth in 41 C.F.R. § 51-3.2 during Phase I of the Cooperative Agreement that will be executed upon approval by the Commission to designate AFB as a new CNA." *Id.* at 77. The memorandum concluded that its "preliminary due diligence review" had revealed no adverse information that would be an obstacle to designating AFB. *Id.* at 78–79.

On June 18, 2018, Commission Deputy Executive Director Kimberly Zeich completed an apparently revised version of a memorandum, originally dated June 11, with her "review and recommendations" of the decision to designate AFB. *Id.* at 52–54. An additional draft was released on June 21. *Id.* at 49–51. Somewhat matching other Commission materials, the memorandum explained that the Commission's goal in proposing a new CNA model was motivated by a "stagnation in growth of employment opportunities" under the AbilityOne Program, "particularly for people who are blind." *See id.* at 49. Zeich attributed this issue to a lack of attention by the existing CNAs to developing opportunities for "knowledge work" as opposed to manufacturing or direct labor service positions. *Id.* The purpose of designating an additional CNA would be "to seek new types of employment opportunities" for "nonprofit agencies in the blind community, and particularly, to develop knowledge work." *Id.* at 50. Designating "one or more additional CNAs" would not be intended to "duplicate the status quo" of the existing CNAs, "but to seek new types of employment opportunities." *Id.*

Discussing AFB's fitness for this role, Zeich described the organization's history of advocacy for the Wagner-O'Day Act and stated that it "is involved in expanding opportunities for people who are blind, including employment." *Id.* Further, "AFB's Chief Executive Officer has extensive experience leading a large nonprofit agency in the AbilityOne Program, and has personal experience as an individual who is blind." *Id.* at 50. Zeich also explained the basic implementation process for the July 2018 Agreement. AFB would be designated for the purpose of exploring opportunities "to grow jobs for people who are blind in knowledge work," which it would propose to the Commission in "a business plan." *Id.* at 51. The Commission would then approve that plan "[i]f AFB is successful in identifying its niche in terms of knowledge work," and would allow AFB to implement the plan in "another phase of performance." *Id.* Zeich

additionally noted that "[a]mong national advocacy organizations for people who are blind, AFB is a good fit for the new CNA because of the overlap between its strategic direction and the AbilityOne mission, its strong history and present leadership in the blindness community, and its neutrality in terms of business and legislative interests." *Id.* at 50. Expanding on this point, Zeich explained that "[t]here is [sic] a limited number of national organizations for people who are blind excluding the current CNA, and two of the three prominent national organizations have some competing business, political, or philosophical differences with the AbilityOne Program." *Id.* at 51.

A final "Decision Document" for Commission members to review in determining whether to vote for AFB's designation was also released on June 18. Echoing Zeich's memorandum, the Decision Document states that the "specific intent" of designating a new CNA is "to build a new CNA model that enables members of the blind community to obtain knowledge based employment, living wages, upward mobility and advance in integrated work environments." *Id.* at 9. AFB fit well for this role, the Decision Document explained, in light of its "long history of innovation as well as inspirational leaders and advocates" since its founding in 1921, its "significant advocacy and support of the Wagner-O'Day Act" in 1938 and the JWOD Act in 1971, and its work "pioneer[ing] efforts such as the first national directory of services, audio books, and talking paper currency identification." *Id.* at 8. In general, the Document stated, AFB "has been at the forefront of change and advancement for the benefit of people who are blind and visually impaired throughout its history." *Id.* Further, under the leadership of a new President and CEO, AFB adopted a "new strategic imperative and mission" in 2017 that Commission staff believed matched well with the agency's goal of "increas[ing] employment and career opportunities for people who are blind or visually impaired" with its new CNA model.

*Id.* at 8–9. The Decision Document also justified AFB's initial exemption from CNA regulatory requirements, explaining that requirements to perform functions related to affiliated NPAs cannot be met because a new CNA will not have NPAs, and fulfilling other requirements immediately upon designation would be impossible or futile. *Id.* at 7.

Attached to the Decision Document were a variety of materials, including the Hammond Award Decision Document dated June 14, 2018, two versions of the Zeich memorandum, a memorandum prepared by Senior Advisor Hoey, and the Nickerson Kenealy due diligence memorandum. A screenshot of a digital voting system shows that voting on the designation was opened on June 19, 2018, and that votes were entered on June 21 and June 22, all approving the designation. *See id.* at 208. On June 27, however, Executive Director Tina Ballard prepared and circulated a memorandum responding to the concerns raised in the June 11 MFR by "certain Commission staff members in the Program Management Office and Policy and Programs office." *Id.* at 109. According to Ballard's review, the MFR had raised three concerns: "the clarity of the RFP and AFB's response to the RFP;" "the lack of competition to identify designees;" and "AFB's capability, qualifications and financial stability to perform the work." *Id.* With respect to the RFP, Ballard explained that "[t]he RFP . . . was cancelled, as it solicited a type of contract vehicle that my staff later determined was not advantageous to the government." *Id.* at 110. Therefore, "[n]either the cancelled RFP, nor the response (which is moot) have bearing on the subsequent draft Cooperative Agreement," and "[a]ccordingly, concerns about the RFP or the response are not relevant to the Commission's current decision." *Id.*

The non-competitive process used to select AFB, Ballard continued, was acceptable because there was no statutory requirement that competition be used. *Id.* Finally, Ballard stated that AFB "provided multiple documents demonstrating [its] capability, qualification and

financial stability to perform the research required in Phase I." *Id.* AFB's qualifications included its "work in the blindness field," "the resumes of [its] key staff members, and audited financial statements showing that AFB has more than $16 million in unrestricted assets." *Id.* Ballard explained that "Phases II or III may or may not be exercised" if requirements of the prior phases are not completed. *Id.* Ballard also provided copies of the June 11 MFR and the June 7, 2018 memorandum from the same author with her annotations disputing the concerns raised. *Id.* at 112–17. Ballard's final comment explained that the author of the memoranda had raised the concerns late in the designation process but that Ballard had decided to circulate the dissenting materials and extend the voting period on the Decision Document by an additional week so that the materials could be reviewed by Commission members. *Id.* at 117. Commission Chief of Staff Kelvin Wood then emailed Ballard's memorandum to Commission members on June 28 for their review. *Id.* 107–08. Each responded confirming their earlier votes to approve the designation. *Id.* at 183–97, 221–22.

On careful review of this record, the Court finds that while the Commission's process for selecting AFB was perhaps not a model of circumspect decisionmaking, it was not unlawful under the APA. The Court is guided by the deferential standard of review of allegedly arbitrary and capricious agency action, which bears reiterating. "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal.*, 556 F.3d at 192. "Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the

choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). Courts "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Sanitary Bd. of City of Charleston*, 918 F.3d at 333 (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). In this case, the Administrative Record demonstrates that the Commission adequately considered the evidence before it and made a reasonable decision in order to further the purposes that Congress directed it to pursue. Though the Court acknowledges that many seemingly valid concerns were raised with the designation of AFB, overturning the designation and the July 2018 Agreement would be tantamount to the Court substituting its judgment for that of the agency.

Several components of the record point the Court to this conclusion. First, despite internal dissent about whether AFB was qualified for the role of CNA, the record ultimately shows that the agency considered dissenting views and articulated a rational connection between the facts before it and its designation decision. The final Decision Document presented to Commission members explains that the purpose of designating AFB is to build a new CNA model focused on knowledge-based employment and that AFB fit well for that role because of its "long history of innovation as well as inspirational leaders and advocates." ECF No. 26-3 at 8. The memorandum further explains that AFB has historically been "at the forefront of change and advancement for the benefit of people who are blind and visually impaired throughout its history," and had recently adopted a "new strategic imperative and mission" that Commission staff believed matched well with the agency's goal – mandated by Congress in the JWOD Act – of increasing employment and career opportunities for the blind. *Id.* at 8–9. This assessment of AFB's capabilities and the alignment of its skills and mission with the Commission's needs, which is echoed in the memorandum authored by Deputy Executive Director Zeich, *id.* at 50–51,

provides an explanation of the reasons for the agency's decision that is adequate under arbitrary and capricious review.

Plaintiff would have the Court strain the bounds of its role by carefully scrutinizing whether the Commission correctly found that AFB's achievements and capabilities qualify it to carry out the requirements for CNAs. Defendants, presumably, are expert in issues relating to employment of the blind, while "generalist judges [are] obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority." *City of L.A. v. U.S. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999). The record shows that Executive Director Ballard reviewed the memoranda from Commission staff who felt that AFB was unqualified, gave responses to support her differing view of the evidence, and presented both positions to the members of the Commission, who unanimously voted to proceed with AFB. *See* ECF No. 26-3 at 107–17, 143–44, 183–97, 221–22. Importantly, that Ballard overruled the documented objections of the dissenting Commission staff does not in and of itself raise alarm. Agency leadership may permissibly depart from the views of subordinate staff as long as the agency's ultimate decision is based on the relevant factors and is satisfactorily explained. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2570–71 (2019). Moreover, nothing in the record suggests that the Commission members did not consider the dissenting opinions in their final decisions. Instead, the record shows that the dissenting materials were put before the members and that they unanimously reaffirmed their votes to proceed. *See* ECF No. 26-3 at 183–97, 221–23. The Court cannot conclude that the agency made a "clear error of judgment" in this process. *Defs. of Wildlife*, 931 F.3d at 345 (4th Cir. 2019) (quoting *Marsh*, 490 U.S. at 378).

To be sure, there are indications in the record, particularly in General Counsel Nickerson Kenealy's due diligence memorandum, that the agency lacked full clarity on what AFB's track

record of innovation portended for its future success as a CNA. *See* ECF No. 26-3 at 74 ("It is not clear how AFB intends to leverage its ability to promote information about assistive technology to translate to innovations in the workplace and rehabilitative training for people who are visually impaired"). The fact that the Decision Document did not present AFB's response to the RFP to the Commission members is another weak point in the agency's process.[17] But this evidence still falls short of the high threshold that Plaintiff must meet to show that the agency acted not only unwisely but unlawfully. Notably, the general counsel's memorandum also clarifies that "we expect that the research AFB conducts during Phase I will provide" AFB's plans for applying its background of innovation to developing knowledge-based employment. *Id.* And Ballard's memorandum to Commission members underscores that the July 2018 Agreement allows the Commission to terminate AFB's designation if its results at Phase I are unsatisfactory. *See id.* at 110. That the Commission consciously incorporated this safeguard into the July 2018 Agreement further demonstrates that despite some deficiencies in the agency's process, the decision to proceed with AFB was within the realm of reasonableness and was not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The Court would exceed the scope of its deferential review in concluding otherwise.

The Court is unmoved by Plaintiff's repeated focus on the statement in Deputy Executive Director Zeich's memorandum that "[t]here is [sic] a limited number of national organizations for people who are blind excluding the current CNA, and two of the three prominent national organizations have some competing business, political, or philosophical differences with the

---

[17] In her memorandum to the Commission members, however, Director Ballard explained that the RFP and AFB's response were replaced, and thereby rendered moot, by the draft cooperative agreement between the Commission and AFB. *See* ECF No. 26-3 at 110.

AbilityOne Program." ECF No. 26-3 at 51; *see* ECF No. 30 at 46, 48. This passage certainly suggests that there were additional rationales for the Commission's decision to pursue AFB for the designation over the two other "national organizations," which Plaintiff claims include NFB. *See* ECF No. 30 at 48. But Defendants did not act arbitrarily and capriciously by failing to spell out the full array of reasons underlying the decision to designate AFB. Agency decisions are "routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *New York*, 139 S. Ct. at 2573. "[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.* (citing *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185–86 (10th Cir. 2014)). Further, Plaintiff makes no suggestion that Zeich's statement indicates impermissible discrimination against Plaintiff on the basis of its political views. Instead, Plaintiff argues that the agency's decision to select AFB without competition was arbitrary and capricious because only three organizations could fill the CNA role and the agency could have easily solicited and reviewed proposals from all three. *See* ECF No. 30 at 15–16. As discussed previously, however, Plaintiff has pointed to no authority that requires the Commission to solicit competitive bids before designating a CNA. The decision not to do so was therefore within the Commission's discretion.

In sum, despite an agency decisionmaking process that was marked by some amount of internal division and that included shifting expectations for the eventual designee, the Court cannot conclude that the Commission's designation of AFB was arbitrary and capricious. Frustrated somewhat justifiably with the limitations of the Administrative Record – which does not include AFB's response to the RFP, an omission that Defendants struggled to explain at the Court's hearing on their motion – Plaintiff argues that the Court should order extra-record

discovery so that Plaintiff can further examine the designation and explore whether the Commission's litigation positions may be taken in bad faith. The Court will decline this belated request. In APA cases, "[t]here is a presumption that the record compiled by the agency is the record on which it rested its decision," and "[a]ccordingly, courts will ordinarily assume that the administrative record is complete and exclusive for purposes of judicial review." *Sanitary Bd. of City of Charleston*, 918 F.3d at 334. "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," a doctrine that "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *New York*, 139 S. Ct. at 2573 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). For these reasons, "[a] party challenging an agency bears a special burden of demonstrating that the court should reach beyond the record, either to examine information that should have been before the agency but was not, or to introduce extra-record evidence that the agency actually relied on that was omitted from the administrative record." *Sanitary Bd. of City of Charleston*, 918 F.3d at 334.

Plaintiff here has made no such showing. In fact, Plaintiff never moved to supplement the record, the first step in obtaining extra-record materials, and only articulated its intention to seek discovery at the hearing on Defendants' motion for summary judgment. The Court will not permit Plaintiff's eleventh-hour effort to draw additional evidence from Defendants at this late stage of the litigation. Instead, because Plaintiff has failed to demonstrate on the existing record that the Commission acted arbitrarily and capriciously in designating AFB and entering the July 2018 Agreement, the Court will grant summary judgment to Defendants on the substantive APA

claim. Having granted summary judgment to Defendants on each of Plaintiff's claims, the Court has no need to proceed to Plaintiff's motion for a preliminary injunction.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Injunction and will grant Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, by granting summary judgment to Defendants on each of Plaintiff's claims. A separate Order shall issue.


Date: <u>September    30, 2019</u>                    <u>      /s/                                    </u>
                                                    GEORGE J. HAZEL
                                                    United States District Judge